**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| RENEE GALLOWAY, DIANNE TURNER, EARL BROWNE, ROSE MARIE BUCHERT, REGINA NOLTE, KEVIN MINOR, and TERESA TITUS, as individuals and as representatives of the classes,<br><br>Plaintiffs,<br><br>v.<br><br>BIG PICTURE LOANS, LLC; MATT MARTORELLO; and ASCENSION TECHNOLOGIES, INC.<br><br>Defendants. | Case No.  3:18cv406<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiffs, Renee Galloway, Dianne Turner, Earl Browne, Rose Marie Buchert, Regina Nolte, Teresa Titus and Kevin Minor *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Class Action Complaint against Defendants, allege as follows:

## GENERAL ALLEGATIONS

1.     This is a case about a scheme to make online usurious short terms loans (commonly called "payday loans"). These loans carry triple-digit interest rates, often exceeding 400%, and are illegal.

2.      Payday loans target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities. Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.      In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws.

4.      In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

5.      Federal banking regulators shut down these "rent-a-bank" schemes. Michael A. Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC PERSPECTIVES 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

6.      Some payday lenders have since developed a new method to attempt to avoid state usury laws—the "rent-a-tribe" scheme.

7.      In a rent-a-tribe scheme, the payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and state law by piggy-backing on the tribe's sovereign legal status and its general immunity from suit under federal and state laws. Using this doctrine, lenders argue that because their businesses are located on a Native American reservation or affiliated with a Native American tribe, they are bound by the laws of that reservation or tribe only, not federal or state law. *See* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 759 (2012).

8. Like its predecessors, this scheme is doomed to fail, because even a cursory examination of the underlying relationship between the payday lender and the tribe demonstrates that the relationship is insufficient to permit the lender to avail itself of the tribe's immunity.

9. Rent-a-tribe schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state and federal law, with the vast majority of the revenues going to non-tribal entities.

10. In recent years, these rent-a-tribe schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their role.[1]

11. This case is about one such rent-a-tribe scheme. In this case, non-tribal member Matt Martorello provided the capital, marketing, underwriting, and other resources for Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension"), two entities formed under by the Lac Vieux Band of Chippewa Indians for the sole purpose of making illegal loans and avoiding state and federal law through the artifice of immunity created by the rent-a-tribe scheme.

12. Plaintiffs, on behalf of themselves and the Classes set forth below, seek to recover damages and penalties under state and federal law for Defendants' illegal and usurious loans.

## JURISDICTION AND VENUE

---

[1] See The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

13.     The Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

14.     The Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs are citizens of Virginia, California, Illinois, Indiana, Ohio, and Washington, at least one defendant is not a citizen of any of those states, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

15.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District. Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). Defendants have transacted their affairs in this District through the nationwide scheme, which collected millions of dollars from Virginia consumers. As part of their scheme, Defendants solicited Virginia consumers with direct mails, debited Virginia consumers' bank accounts, and serviced the illegal loans of thousands of Virginia consumers.

## PARTIES

16.     Plaintiff Renee Galloway is a natural person who resides in this District and Division.

17.     Plaintiff Diane Turner is a natural person who resides in Rocky Mountain, Virginia.

18.     Plaintiff Earl Browne is a natural person who resides in Burbank, California.

19.     Plaintiff Rose Marie Buchert is a natural person who resides in Rockford, Illinois.

20.     Plaintiff Regina Nolte is a natural person who resides in Indianapolis, Indiana.

21. Plaintiff Kevin Minor is a natural person who lives in Toledo, Ohio.

22. Plaintiff Teresa Titus is a natural person who resides in Ridgefield, Washington.

23. Defendant Matt Martorello is a natural person and resident of Puerto Rico. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein. As explained below, Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

24. Defendant Big Picture Loans is a purported tribal entity incorporated under the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("the Tribe") and located in Watersmeet, Michigan. Big Picture operates a business as an internet lending website under the domain name www.bigpictureloans.com. In return for a small fraction of the revenue, the Tribe allowed the lending scheme to use its name and falsely claim that it is operated by the Tribe. At all times relevant hereto, the Tribe did not participate in the day-to-day operations of Big Picture Loans and did not fund the loans or handle the servicing or collection of the loans. Big Picture Loans was formerly known as Red Rock Tribal Lending, LLC, who did business under the domain name www.castlepayday.com. Big Picture Loans is the successor-in-interest of Red Rock.

25. Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital was a limited liability company previously organized under the laws of the U.S. Virgin Islands and then Puerto Rico. Bellicose Capital was formed by Martorello in 2011 to make the usurious loans to consumers in violation of state law. Although Defendants held it out as a "managing consulting company," Bellicose Capital was the actual entity that procured the investment capital, serviced the loans, and received the vast majority of the revenue from the loans, which was then funneled

to Martorello. Due to various lawsuits against Martorello's competitors and anticipated regulation from the Consumer Financial Protection Bureau ("CFPB"), Martorello transferred Bellicose to the Tribe in January 2016 in an attempt to shield Bellicose Capital's illegal business practices. The Tribe rebranded Bellicose as Ascension Technologies, which continues to operate with no tribal involvement or benefit to the Tribe.

## SERVICE ON THE ATTORNEY GENERAL

26.     Counsel for Plaintiffs are causing a copy of this pleading to be served contemporaneously with this filing on the Attorney General of Washington in accordance with RCW 19.86.095, and on the Attorney General of Illinois in accordance with 815 ILCS 505/10a(d).

## STATE USURY AND CONSUMER PROTECTION LAWS[2]

### A. Virginia

27.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984). The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972).

---

[2] Usury laws are not unique to the United State of America. Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin." Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012). Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country." Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

28.     In accordance with this longstanding public policy, Virginia's Consumer Finance Act prohibits a person from charging an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth. Va. Code §§ 6.2-1501(A), 6.2-303(A). The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants.

29.     The Virginia General Assembly has expressly declared that any attempt to circumvent usury laws is "against public policy and void." Va. Code. § 6.2-306(A) ("Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void."). This includes attempts to evade the application "by any device, subterfuge, or pretense whatsoever," including "procurement of a loan through any use or activity of a third person, whether real or fictitious." Va. Code. § 6.2-1541(C).

30.     Any loan made in violation of Virginia's usury laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made." Va. Code § 6.2-1541(A)-(B).

**B. California**

31.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872. Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

32.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any

money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

33.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

34.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.*

35.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

36.     Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

37.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq.*, which prohibits unlawful, unfair, *or* deceptive business practices. Cal. Bus. & Prof. Code § 17200.

**C.  Illinois**

38.     Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less.  205 ILCS 670/15.

39.     Small consumer loan lenders are required to be licensed to make loans.  205 ILCS 670/1.  A licensed lender may charge interest rates up to 99%.  *See* 205 ILCS 670/17.2(a)(1), (b)(3)).

40.     In a lender is unlicensed, annual interest is capped at 9%: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest." *See* 815 ILCS 205/4(1).

41.     If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

42.     Through a civil action, a borrower can sue a lender for violating the Illinois Consumer Installment Loan Act "prior to the expiration of 2 years after the date of his last scheduled payment" to reduce the balance by the amount that the lender is entitled to recover, and to recover attorneys' fees and costs.  205 ILCS 670/20(b); 205 ILCS 670/20.7

43.     The Illinois Consumer Fraud Act also provides a remedy for consumers who are the victim of unfair or deceptive acts or practices in trade or commerce. 815 ILCS 505/2; 815 ILCS 550/10a.

**D.  Indiana**

44.     In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana. Indiana Code § 24-4.5-3-502. A separate license is required for making small loans of less than $550. *Id.* If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

45.     Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150. Ind. Code § 24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;

(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal.

Ind. Code § 24-4.5-3-508.

46.     "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt." Ind. Code § 24-4.5-5-202.

47.     In addition to these penalties, debtors on small loans are also entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees." Ind. Code § 24-4.5-7-409.

### E.  Ohio

48.     "The [legislature's] right to regulate the rate of interest by law is as old as government itself." *Wessell v. Timberlake*, 116 N.E. 43, 46 (Ohio 1916).

49.     Ohio law generally caps interest rates at 8% per annum. Ohio Rev. Code § 1343.01(A).

50.     Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less. Ohio Rev. Code § 1321.02.  For loans between $1,000 and $5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000. Ohio Rev. Code § 1321.13(A).

51.     Any lender who charges interest rates in excess of those provided by law "shall forfeit to the borrower twice the amount of interest contracted for." Ohio Rev. Code § 1321.14(D).

52.     Lenders licensed under Ohio's Short-Term Loans Law may charge interest rates no greater than 28% APR on loans of $500 or less. Ohio Rev. Code § 1321.35–40. Licensees must be located in Ohio. Ohio Rev. Code § 1321.36.

53.     Any interest charged in excess of 28% APR on loans of $500 or less is deemed an unfair or deceptive business practice in violation of Ohio's Consumer Sales Practices Act ("CSPA"). Ohio Rev. Code §1321.44(A). A short-term borrower injured by excessive interest rates "shall have a cause of action and be entitled to the same relief available to a consumer under [the CSPA]." Ohio Rev. Code §1321.44(A).

54.     Ohio's Consumer Sales Practices Act allows injured borrowers to "recover [their] actual economic damages plus an amount not exceeding five thousand dollars in noneconomic damages." Ohio Rev. Code § 1345.09(A).

**F. Washington**

55.      Washington's usury laws were "enacted in order to protect the residents of this state from debts bearing burdensome interest rates" and "in recognition of the duty to protect our citizens from oppression." RCW 19.52.005.

56.      In Washington, the maximum allowable interest rate is twelve percent per annum. RCW 19.52.020(1); *see also* RCW 19.52.025; State Maximum Interest Rate, *available at* http://leg.wa.gov/CodeReviser/Documents/rates.htm. "No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action." RCW 19.52.020(1).

57.      If interest greater than the statutory maximum of twelve percent is directly or indirectly contracted for, received, or reserved, the contract is usurious. RCW 19.52.030.

58.      If a usurious interest rate is charged, the creditor shall be entitled to collect only the principal amount of the loan, less the amount of interest accruing thereon, and if any interest was actually paid, the creditor shall be entitled to collect only the principal amount less twice the amount of the interest paid and less the amount of all accrued by unpaid interest. RCW 19.52.030. A plaintiff may seek application of these statutory penalties by bringing an action under RCW 19.52.032.

59.      RCW Chapter 19.52 applies to loans made to any person residing in Washington at the time the loan was made, regardless of the location where the loan was made. RCW 19.52.034.

60.      In addition to a statutory usury claim entitling a plaintiff to recover the penalties provided in RCW 19.52.030, entering into or transacting a usurious contract constitutes a per se

unfair act or practice in the conduct of commerce for purposes of establishing a claim under the

Washington Consumer Protection Act. RCW 19.52.036.

### DEFENDANTS' SCHEME TO AVOID STATE USURY AND CONSUMER PROTECTION LAWS

61.     Defendants operate a rent-a-tribe scheme that charges more than 400% annual interest on short term loans.

62.     The architect of the scheme is Matt Martorello, a Chicago entrepreneur and non-tribal member who owns Bellicose Capital. With the assistance of Martorello and Bellicose, several tribal officials helped form two "business enterprises" of the Tribe—the companies Big Picture Loans and Red Rock Tribal Lending, LLC ("Red Rock")—that claimed to be "wholly owned" and "operated as an instrumentality of the Tribe."

63.     Starting in 2011, Martorello began offering high interest loans through these companies. Red Rock operated using the website www.castlepayday.com. Big Picture is the successor-in-interest to Red Rock.

64.     The Tribe and Tribal entities received only 2% of profits from the loans, while Martorello and his companies, including Bellicose Capital, reaped nearly all of the profits and provided the resources to market, fund, underwrite, and collect on the loans. *See* Delvin D. Hawley, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("Matt Martorello's company, Bellicose Capital, helps an American Indian tribe in Michigan run websites that offer small loans to the public at annualized interest rates as high as 780 percent. The tribe gets 2 percent of the revenue, while Martorello makes millions.")

65.     Bellicose Capital procured the investment capital, serviced the loans, and received most of the revenue from the loans. Bellicose also provided lead generation, technology,

payment processing, and collection services for the loans. Bellicose provided these services with non-tribal employees located outside of the Lac Vieux Reservation.

66.    The Tribe has no control over the income or expenses of either Red Rock or Big Picture Loans.

67.    Tribal members provide minimal assistance in the day-to-day operations of Red Rock and Big Picture Loans, and nearly all the activities associated with these companies occurred off the Lac Vieux Reservation, such as the call centers, payment processing, and servicing of the loans.

68.    Despite representations in the loan agreements that Big Picture Loans and Red Rock were owned and operated by the Tribe, Bellicose Capital was the *de facto* owner and controlled the operations of the Big Picture and Red Rock.

69.    Moreover, nearly all activities performed on behalf of Big Picture and Red Rock were performed by officers and employees of Bellicose who were not located on the Lac Vieux Reservation. Instead, they were Bellicose Capital employees located in the Virgin Islands, Puerto Rico, and the Philippines.

70.    Bellicose Capital also handled the lead generation used to identify and solicit potential consumers.[3]

71.    For example, Bellicose Capital procured consumer reports from Trans Union in an attempt to identify consumers who may be susceptible or in need of a loan.

---

[3] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans. Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), https://bit.ly/2sIErJG. Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine whether a consumer has ever applied or received an internet loan or whether a consumer may be in need or qualify for an additional loan. *Id.*

72.     If a consumer's report showed that he or she may be susceptible to a high-interest loan, then Bellicose Capital sent direct mailings to the home of the consumer stating that he or she was pre-approved, that the loan is "a smarter way to borrow," and that funds can be deposited "as early as tomorrow."

73.     If a consumer called the number on the letter, he or she would reach a call center in the Philippines, who took direction and instructions from Bellicose Capital and not the Tribe.

74.     In the past few years, regulators have begun cracking down on rent-a-tribe arrangements.

75.     In 2013, the New York Department of Financial Services issued a cease and desist order to Red Rock, requesting that Red Rock cease providing loans to New York residents.

76.     In response, Red Rock filed a lawsuit seeking a preliminary injunction against the New York Department of Financial Services. The district court denied the motion for preliminary injunction and the Second Circuit affirmed the decision, finding that the loans were subject to New York's anti-usury laws. *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014).

77.     At this time, the Federal Trade Commission brought suit against a similar rent-a-tribe scheme operated by Scott Tucker and Timothy Muir. The FTC obtained a $1.3 billion dollar judgment, and Tucker and Muir were convicted in the Southern District of New York on racketeering charges.[4]

---

[4] *See* https://www.ftc.gov/news-events/blogs/business-blog/2016/10/record-13-billion-ruling-against-scott-tucker-others-behind; https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

78.    Just like Tucker and Muir, Defendants' business relationship with the Tribe was nothing more than an attempt to mislead consumers and regulators by creating the illusion that the Defendants were protected by tribal immunity.

79.    After several of these rent-a-tribe schemes were uncovered through private lawsuits and governmental enforcement actions against Defendants' competitors, Martorello "sold" Bellicose Capital to the Tribe in an effort to further insulate the scheme from liability. Bellicose was rebranded as Ascension Technologies, LLC.

80.    As part of this arrangement, the Tribe paid Martorello $1.3 million. In addition, the Tribe agreed to pay him as much as $300 million in future payments. In other words, the Tribe continues to accept a nominal fee in return for the use of its name.

81.    And while it is now nominally organized under the laws of the Tribe, Ascension Technologies continues to be operated in the same manner and by the same individuals who ran Bellicose Capital—none of whom are affiliated with the Tribe.

82.    For example, approximately 20 individuals identify Ascension Technologies as their employers on LinkedIn. However, none of these people are located on the Tribe's reservation. Instead, many of them list Atlanta, Mississippi, or Puerto Rico as the place where they are located. None of these people appear to be members of the Tribe and nearly all of the activities of Ascension Technologies are performed by these non-Tribal members who are not located on the reservation.

83.    Ascension is also registered to do business in Puerto Rico. Because of its registration as a foreign corporation, Ascension has "the same rights, privileges, duties, restrictions, penalties, and responsibilities" as a domestic corporation formed under the laws of

Puerto Rico. *See* 14 L.P.R.A. § 3806. This includes the power to "[s]ue and be sued under its corporate name *in any court*. . . ." 14 L.P.R.A. § 3522 (emphasis added).

84.     Big Picture employs only a handful of Tribal employees and the majority of its employees are non-Tribal members. The Tribal employees perform clerical tasks and respond to consumer emails using pre-approved templates.

85.     The Tribe receives little benefit from its "ownership" of Ascension and Big Picture.

86.     In other litigation, Big Picture has stated that it "does not make a profit for itself" and that Ascension "does not make money."

87.     Big Picture receives a flat fee of 3% from the net profits of the loans.

88.     In 2014 and 2017, the Washington Department of Financial Institutions issued a warning to consumers that Big Picture, along with other lenders associated with the Lac Vieux Desert Band of Lake Superior Chippewa Indians, were not licensed in the state of Washington or registered to conduct business in Washington.[5]

## PLAINTIFFS' EXPERIENCES

### A.  Plaintiff Renee Galloway (Virginia)

89.     On or around April 21, 2017, Plaintiff Galloway obtained a loan for $600 with Big Picture Loans that had an interest rate of 636.75%.

90.     Ms. Galloway paid $930 on her loan with Big Picture Loans, almost all of which was credited to interest and fees.

91.     As part of her application, Plaintiff Galloway entered in her Virginia residential address.

---

[5] *See* https://dfi.wa.gov/consumer/alerts/lac-vieux-desert-lvd-band-tribe-community-not-licensed-washington.

### B. Plaintiff Diane Turner (Virginia)

92.     On October 12, 2015, Plaintiff Turner obtained a $400 loan with Red Rock that had an interest rate of 615%.

93.     Ms. Turner paid no less than $560 on her loan with Red Rock, almost all of which was credited to interest and fees.

94.     As part of her application, Plaintiff Turner entered in her Virginia residential address.

### C. Plaintiff Earl Browne (California)

95.     On February 2, 2017, Plaintiff Earl Browne obtained a loan with Big Picture Loans that had an interest rate of 697%.

96.     Plaintiff Browne paid no less than $1,124.09 on his loan with Big Picture within the past year, most of which was credited to interest and fees.

97.     As part of his application, Plaintiff Browne entered in his California residential address.

### D. Plaintiff Rose Marie Buchert (Illinois)

98.     On October 9, 2015, Plaintiff Rose Marie Buchert applied for a $250 loan from Red Rock. The loan had an interest rate of 755% requiring monthly payments with a final payment due on August 3, 2016.   The finance charge was $1,000.

99.     In October 2016, Ms. Buchert took out a second loan that was identical in amount, interest rate, and payment plan to her first loan.

100.    As part of her applications, Ms. Buchert entered in her Illinois residential address.

101.    Ms. Buchert paid off both loans, including $2,000 in finance charges.

### E. Plaintiff Regina Nolte (Indiana)

102.    Plaintiff Regina Nolte has took our a $450 loan from Big Picture that was deposited into her account on December 20, 2016.   The interest rate on the loan was at least 200%.

103.    As part of her application, Ms. Nolte entered her Indiana residential address.

104.    Ms. Nolte paid Big Picture in excess of the principal amount on her loan.

**F.  Plaintiff Kevin Minor (Ohio)**

105.    On or about May 5, 2016, Plaintiff Kevin Minor received a $900 loan from Big Picture. The loan had an annual interest rate that exceeded 44%.

106.    On or about August 4, 2016, Mr. Minor received a $1,000 loan from Big Picture. The loan had an annual interest rate that exceeded 56%.

107.    Mr. Minor made multiple payments on his Big Picture Loan, and paid off at least one of his loans with Big Picture in full.

108.    As part of his loan applications, Mr. Minor entered his Ohio address.

**G.  Plaintiff Teresa Titus (Washington)**

109.    On or about July 14, 2015, Plaintiff Titus applied for a loan at www.castlepayday.com. Ms. Titus was approved for a loan for $400.00. The loan had an annual interest rate over 400%.

110.    On July 14, 2015, $400 was deposited into her bank account by "Castle Payday.com."

111.    By June 2016, Ms. Titus had paid Defendants a total of $2,281.25 on her July 2015 loan. But when she could no longer afford her payments on the loan, she had to take out another loan to cover her payments on the first loan. Over the course of the next year, Ms. Titus

suffered from this debt treadmill whereby she had to take out new loans in order to pay back old loans.

112.     In addition to her original loan, Ms. Titus took out loans from Defendants in June 2016 ($500) and July 2017 ($400). These loans both had annual interest rates in excess of 400%. These loans were deposited into Ms. Titus's bank account by "VBS Big Picture Loans" and "Big Picture Loans," respectively.

113.     Since August 2015, Ms. Titus has paid $4,994.11 to Defendants toward her $1,300 principal in Castle Payday/Big Picture loans. Ms. Titus has also paid $175 in overdraft fees and returned item charges associated with automatic bank account debits for her Castle Payday/Big Picture payments.

114.     As part of her application for these loans, Ms. Titus entered in her Washington residential address.

115.     Defendants are still attempting to collect additional payments from Ms. Titus.

## CLASS ACTION ALLEGATIONS

116.     Plaintiffs Galloway and Turner assert their Virginia claims on behalf of the proposed Virginia Class defined as follows:

> *All individuals located in Virginia who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

117.     Plaintiff Browne asserts his California claims on behalf of the proposed California Class defined as follows:

> *All individuals located in California who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

118. Plaintiff Buchert asserts her Illinois claims on behalf of the proposed Illinois Class defined as follows:

> *All individuals located in Illinois who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

119. Plaintiff Nolte asserts her Indiana claims on behalf of the proposed Indiana Class defined as follows:

> *All individuals located in Indiana who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

120. Plaintiff Minor asserts his Ohio claims on behalf of the proposed Ohio class defined as follows:

> *All individuals located in Ohio who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

121. Plaintiff Titus asserts her Washington claims on behalf of the proposed Washington Class defined as follows:

> *All individuals located in Washington who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

122. Plaintiffs also assert claims on behalf of the proposed RICO Class defined as follows:

> *All individuals located in Virginia, California, Illinois, Indiana, Ohio, or Washington, or states with similar laws who entered into a loan agreement with Big Picture or Red Rock.*

**Numerosity**

123. At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the volume of Defendants' business, there are likely thousands of members of each Class. Thus, the Classes are so numerous that joinder of all members is impracticable.

**Commonality**

124. There are numerous common questions of law and fact common to Plaintiffs and members of the Classes. These questions include but are not limited to the following:

    a.    Whether Defendants violated state usury laws;

    b.    Whether Defendants are protected by tribal sovereign immunity;

    c.    Whether Defendants engaged in unfair or deceptive acts or practices;

    d.    Whether Defendants, Bellicose Capital, Source Point, the tribal officials, and others unknown to Plaintiffs, constitute an "enterprise" under RICO;

    e.    Whether Defendants conducted the affairs or participated in the enterprise's affairs;

    f.    Whether Defendants violated RICO by charging interest rates more than

twice the legal limit under state law;

g.     The proper measure and amount of damages for the Classes.

**Typicality**

125.   Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Each Plaintiff, like members of the Classes, took out a usurious loan from Defendants. Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices of conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

126.   Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience in litigating "rent-a-tribe" cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests that conflict with the Classes.

**Injunctive Relief**

127.   The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**Predominance and Superiority**

128.    The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

a.    Absent a class action, class members as a practical matter will be unable to obtain redress; Defendants' violations will continue without remedy; and additional consumers will be harmed.

b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.    The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e.    Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of RICO, 18 U.S.C. §§ 1962(c) & (d)
### (On behalf of all Plaintiffs and the RICO Class)

129.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

130.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

131.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Big Picture and Ascension, together with Bellicose Capital and Source Point, are an association in fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4) associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Castle Payday.

132.    The Enterprise had an ongoing organization with an ascertanable structure, and functioned as a continuing unit with separate roles and responsibilities.

133.    Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

134.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

135.    All of the loans made to RICO Class members and collected by Defendants included an interest rate far in excess of twice the enforceable rate in their states.

136.    Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Defendant knowingly agreed to participate in the scheme alleged

herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

137.    Plaintiffs and RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

138.    This conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia, California, Illinois, Indiana, Ohio, Washington, and other states with similar usury laws. Accordingly, Defendants are jointly and severally liable to Plaintiffs and the RICO Class for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of Virginia Usury Laws**
**(On behalf of Plaintiffs Galloway, Turner and the Virginia Class)**

139.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

140.    Under Virginia law, the maximum allowable interest rate on a consumer loan is 12% per annum. Va. Code § 6.2-303.

141.     All of the loans made to Virginia consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 12%.

142.    As a result, Plaintiffs and the Virginia Class are entitled to recover all amounts paid on these void loans, as well as twice the amount of usurious interest repaid. Va. Code § 6.2-1541(B); Va. Code § 6.2-305.

### THIRD CAUSE OF ACTION
### Violation of California Usury Laws
### (On behalf of Plaintiff Browne and the California Class)

143. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

144. Under the California Constitution, the maximum allowable interest rate on a consumer loan is 10% per annum. Cal. Const. Art. XV § 1.

145. All of the loans made to California consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 10%.

146. Accordingly, Plaintiff Browne and members of the California Class are entitled to recover all interest paid on the loans in excess of 10%, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs. Cal. Civ. Code § 1916-3.

### FOURTH CAUSE OF ACTION
### Violations of Cal. Bus. & Prof. Code § 17200
### (On behalf of Plaintiff Browne and the California Class)

147. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

148. As alleged above, Defendants engaged in unlawful, unfair, and deceptive business practices through the sham relationship with the Tribes in order to make high-interest loans to consumers throughout the country, including California.

149. Defendants' conduct violated California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, et seq., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

150.    Accordingly, Plaintiff Browne and California Class members are entitled to recover all interest paid on the loans in excess of 10%, as well as an injunction prohibiting any future collection of the loans. Cal. Bus. & Prof. Code § 17203.

**FIFTH CAUSE OF ACTION**
**Violation of Illinois Consumer Installment Loan Act - 205 Ill. Comp. Stat. 670/1, et. seq.**
**(On behalf of Plaintiff Buchert and the Illinois Class)**

151.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

152.    Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less.  205 ILCS 670/15.

153.    Small consumer loan lenders are required to be licensed to make loans.  205 ILCS 670/1.

154.    If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

155.    Defendants violated Illinois law by charging interest rates making small consumer loans without a license and charging interest rates far in excess of those permitted to licensed

156.    As a result of these unlawful loans, Plaintiff Buchert and the Illinois Class are entitled to recover damages, attorneys' fees, and costs pursuant to 205 ILCS 670/20(b); 205 ILCS 670/20.7.

## SIXTH CAUSE OF ACTION
### Violation of Illinois Consumer Fraud Act – 815 ILCS 505/2
### (On behalf of Plaintiff Buchert and the Illinois Class)

157.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

158.    Defendants, in the course of trade or commerce, engaged in unfair acts and practices, in violation of 815 ILCS 505/2, by contracting for and collecting finance charges, interest, and fees, from Illinois residents, in excess of the amounts permitted by Illinois law.

159.    These unlawful charges caused actual damages to Plaintiff Buchert and the Illinois Class.

160.    Pursuant to 815 ILCS 505/10a, Plaintiff Buchert and the Illinois Class seeks damages for all amount paid to the Defendants, injunctive relief, and attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
### Violation of Indiana Usury Law - Ind. Code § 24-4.5-5-202
### (On behalf of Plaintiff Nolte and the Indiana Class)

161.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

162.    In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana. Indiana Code § 24-4.5-3-502. A separate license is required for making small loans of less than $550. Id. If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

163.    Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150. Ind. Code §

24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

      (a) the total of:

            (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;

            (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

            (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or

      (b) twenty-five percent (25%) per year on the unpaid balances of the principal.

Ind. Code § 24-4.5-3-508.

164.    "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt." Ind. Code § 24-4.5-5-202.

165.    Defendants made loans in Indiana without a license.

166.    Defendants further made loans to Indiana residents at interest rates well in excess of the rates permitted by Indiana law.

167.    As a result, Plaintiff Nolte and the Indiana Class are entitled to recover all amounts paid on these void loans, as well as interest on amounts paid.

168.    Further, debtors on unlawful small loans of $550 or less are entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees," where the conduct did not result from a bona fide computation error. Ind. Code § 24-4.5-7-409.

### EIGHTH CAUSE OF ACTION
### Violation of Ohio Usury Laws
### (On behalf of Plaintiff Minor and the Ohio Class)

169.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

170.    Under Ohio law, the maximum allowable interest rate on a general loan is 8% per annum. Ohio Rev. Code § 1343.01(A).

171.    Any usurious interest paid "shall be taken to be payments made on account of principal." Ohio Rev. Code § 1343.04.

172.    All of the loans made to Ohio consumers in the name of Big Picture and Red Rock contained interest rates in excess of 8% per annum.

173.    As a result, Plaintiff Minor and the Ohio Class are entitled to have any usurious interest charged by Defendants applied to the principal of their loans. Ohio Rev. Code § 1343.04.

### NINTH CAUSE OF ACTION
### Violation of Ohio Small Loans Law
### (On behalf of Plaintiff Minor and the Ohio Class)

174.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

175.    Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less. Ohio Rev. Code § 1321.02. For loans between $1,000 and

$5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000. Ohio Rev. Code § 1321.13(A).

176.    Any loan made in violation of the Small Loans Law—including any loan under $5,000 made by anyone other than a licensed lender—"is void and the lender has no right to collect, receive, or retain any principal, interest, or charges." Ohio Rev. Code § 1321.02.

177.    Further, "[a]ny licensee or other person who willfully violates [the Small Loans Law] shall forfeit to the borrower twice the amount of interest contracted for." Ohio Rev. Code § 1321.14(D).

178.    All of the loans made to Ohio consumers in the name of Big Picture and Red Rock were for amounts under $5,000 and contained interest rates in excess of 28% per annum.

179.    As a result, these loans are void; Defendants have no right to retain any principal, interest, or charges; and Plaintiff Minor and the Ohio Class are entitled to recover twice the amount of usurious interest repaid. Ohio Rev. Code §§ 1321.02 and 1321.14(D).

**TENTHCAUSE OF ACTION**
**Violation of Washington Usury Law - RCW 19.52.030**
**(On behalf of Plaintiff Titus and the Washington Class)**

180.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

181.    Under RCW 19.52.020, the maximum allowable interest rate in Washington has been twelve percent per annum since at least 2004. See also RCW 19.52.025; State Maximum Interest Rate, available at  http://leg.wa.gov/CodeReviser/Documents/rates.htm.

182.    A contract is usurious if it provides for a rate of interest higher than the statutory maximum of twelve percent. RCW 19.52.030(1).

183.    If a contract is usurious, "the creditor shall only be entitled to the principal, less the amount of interest accruing thereon at the rate contracted for; and if interest shall have been paid, the creditor shall only be entitled to the principal less twice the amount of the interest paid, and less the amount of all accrued and unpaid interest; and the debtor shall be entitled to costs and reasonable attorneys' fees plus the amount by which the amount the debtor has paid under the contract exceeds the amount to which the creditor is entitled." RCW 19.52.030(1).

184.    Defendants entered into usurious contracts with Plaintiff Titus and Washington Class members by charging interest rates well in excess of twelve percent.

185.    Therefore, Plaintiff Titus and Washington Class members are entitled to a declaration that Defendants' loan contracts are usurious. Plaintiff Titus and Washington Class members are entitled to recover any amounts paid in excess of the amount Defendants are entitled to collect on the loans, pursuant to RCW 19.52.030.

## ELEVENTH CAUSE OF ACTION
### *Per se* Violation of the Washington Consumer Protection Act – RCW 19.86.020 and RCW 19.52.036
### (On behalf of Plaintiff Titus and the Washington Class)

186.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

187.    Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

188.    Pursuant to RCW 19.52.036, "[e]ntering into or transacting a usurious contract" is per se "an unfair act or practice in the conduct of commerce for purposes of application of the consumer protection act."

189.    As alleged above, Defendants entered into usurious contracts with Plaintiff Titus and Washington Class members by contracting for interest rates exceeding the statutory maximum of twelve percent. Thus, Defendants engaged in unfair acts or practices in the conduct of commerce.

190.    Defendants' unfair and deceptive acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law.

191.    Defendants' unfair acts and practices therefore affect the public interest.

192.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff Titus and the Washington Class have been injured. Defendants' conduct has injured the property of Plaintiff Titus and the other class members by charging and collecting interest that they were not legally entitled to charge or collect.

193.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to make loans to Washington residents at usurious interest rates and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

194.    Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff Titus and Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

## TWELVTH CAUSE OF ACTION
**Violation of the Washington Consumer Protection Act – RCW 19.86 – Deceptive Business
Practices
(On behalf of Plaintiff Titus and the Washington Class)**

195.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

196.    Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

197.    Defendants engaged in deceptive acts that occurred in trade or commerce by conduct set forth above. These deceptive acts include the following:

        a.    Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

        b.    Representing or implying that state law does not apply to Plaintiff Titus's and Washington Class members' loans;

        c.    Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

198.    Defendants' deceptive acts and practices have occurred in trade or commerce.

199.    Defendants' deceptive acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants deceived Plaintiff Titus and members of the Washington Class by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim Big Picture and Ascension are tribal entities not subject to state law.

200.    As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Titus and the Washington Class have been injured. Defendants' conduct has injured the

property of Plaintiff Titus and the other Washington Class members by charging and collecting interest that they were not legally entitled to charge or collect.

201.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

202.    Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff and Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

### THIRTEENTH CAUSE OF ACTION
**Violation of the Washington Consumer Protection Act – RCW 19.86 – Unfair Business Practices**
**(On behalf of Plaintiff Titus and the Washington Class)**

203.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

204.    Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

205.    Defendants engaged in unfair acts that occurred in trade or commerce by conduct set forth above. These deceptive acts include the following:

a.    Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

36

b.     Representing or implying that state law does not apply to Plaintiff Titus's and Washington Class members' loans;

c.     Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

206.    Defendants' acts and practices are unfair because they: (1) cause substantial financial injury to Plaintiff Titus and members of the Washington Class; (2) are not outweighed by any countervailing benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers. Defendants' acts and practices are also unfair because they are immoral, unethical, oppressive and unscrupulous.

207.    Defendants' unfair acts and practices have occurred in trade or commerce.

208.    Defendants' unfair acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants acted unfairly by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim Big Picture and Ascension are tribal entities not subject to state law.

209.    As a direct and proximate result of Defendants' unfair acts and practices, Plaintiff Titus and the Washington Class have been injured. Defendants' conduct has injured the property of Plaintiff Titus and the other class members by charging and collecting interest that they were not legally entitled to charge or collect.

210.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect

unlawful interest on usurious loans already made to Washington residents. Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

211. Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief. In addition, Plaintiff Titus and Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

## FOURTEENTH CAUSE OF ACTION
### Unjust Enrichment
**(On behalf of Plaintiffs and the Virginia, California, Illinois, Indiana, Ohio, and Washington Classes)**

212. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

213. Plaintiffs and Class members conferred a benefit on Defendants when they made payments on loans that were void or made payments of interest beyond the amounts legally collectible under state law.

214. To the detriment of Plaintiffs and Class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from residents of Virginia, California, Illinois, Indiana, Ohio, and Washington.

215. As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions. Accordingly, Plaintiff seeks a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against

Defendants as follows:

A.     An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.     An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.     An Order declaring that Defendants committed the violations of law alleged herein;

D.     An Order providing for any and all injunctive relief the Court deems appropriate;

E.     An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.     An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.     An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.     An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.     Such further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.


RESPECTFULLY SUBMITTED AND DATED this 11th day of June, 2018.

Leonard A. Bennett, VSB #37523
Elizabeth W. Hanes, VSB #75574
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
      elizabeth@clalegal.com

BERGER & MONTAGUE, P.C.
E. Michelle Drake
John G. Albanese
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

TERRELL MARSHALL LAW GROUP PLLC
Beth E. Terrell
Elizabeth A. Adams, WSBA #49175
bterrell@terrellmarshall.com
eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax.: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*