**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| RENEE GALLOWAY, DIANNE TURNER, DOMINIQUE DE LA BAY, ANDREA SCARBOROUGH, EARL BROWNE, ROSE MARIE BUCHERT, REGINA NOLTE, KEVIN MINOR, TERESA TITUS, BURRY POUGH, LISA MARTINEZ, SONJI GRANDY, ANASTASIA SHERMAN, JERRY AVENT, LUCINDA GRAY, ANTHONY GREEN, and LINDA MADISON as individuals and as representatives of the classes, | Case No. 3:18-cv-00406-REP |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| BIG PICTURE LOANS, LLC; MATT MARTORELLO; and ASCENSION TECHNOLOGIES, LLC. | **JURY TRIAL DEMANDED** |
| Defendants. | |

## CLASS ACTION COMPLAINT

COMES NOW Plaintiffs, Renee Galloway, Dianne Turner, Dominique de la Bay, Andrea Scarborough, Earl Browne, Rose Marie Buchert, Regina Nolte, Teresa Titus, Kevin Minor, Burry Pough, Lisa Martinez, Sonji Grandy, Anastasia Sherman, Jerry Avent, Lucinda Gray, Anthony Green, and Linda Madison, *on behalf of themselves and all individuals similarly situated* ("Plaintiffs"), by counsel, and for their Class Action Complaint against Defendants, allege as follows:

### GENERAL ALLEGATIONS

1.      This is a case about a scheme to make online usurious short terms loans (commonly called "payday loans").  These loans carry triple-digit interest rates, often exceeding 400%, and are illegal.

2.      Payday loans target vulnerable borrowers and, left unregulated, can economically devastate borrowers and their communities.  Consumers often renew the loans or take out new loans when they are unable to pay their original loans off, creating a cycle of mounting debt.

3.      In recent years, payday lenders have concocted various schemes to make high-interest loans over the internet while avoiding state usury laws.

4.      In one scheme—the so-called "rent-a-bank" strategy—payday lenders convinced banks headquartered in states with high (or nonexistent) usury limits to form a lending venture in order to capitalize on the fact that the bank was obligated to comply only with the usury law of its home state, even for loans made elsewhere.

5.      Federal banking regulators shut down these "rent-a-bank" schemes.  Michael A. Stegman, *Payday Lending*, 21 JOURNAL OF ECONOMIC PERSPECTIVES 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

6.      Some payday lenders have since developed a new method to attempt to avoid state usury laws—the "rent-a-tribe" scheme.

7.      In a rent-a-tribe scheme, the payday lender—which does most of its lending over the internet—affiliates with a Native American tribe to attempt to insulate itself from federal and state law by piggy-backing on the tribe's sovereign legal status and its general immunity from suit under federal and state laws.  Using this doctrine, lenders argue that because their businesses are located on a Native American reservation or affiliated with a Native American tribe, they are bound

by the laws of that reservation or tribe only, not federal or state law. *See* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 WASH. & LEE L. REV. 751, 759 (2012).

8.  Like its predecessor, this scheme is doomed to fail, because even a cursory examination of the underlying relationship between the payday lender and the tribe demonstrates that the relationship is insufficient to permit the lender to avail itself of the tribe's immunity.

9.  Rent-a-tribe schemes are not designed to promote tribal business but instead are contrivances aimed at avoiding state and federal law, with the vast majority of the revenues going to non-tribal entities.

10.  In recent years, these rent-a-tribe schemes have come under increasing scrutiny from courts and regulators. Two prominent perpetrators were recently convicted and sentenced to prison for their roles.[1]

11.  This case is about one such rent-a-tribe scheme. In this case, non-tribal member Matt Martorello provided the capital, marketing, underwriting, and other resources for Big Picture Loans, LLC ("Big Picture") and Ascension Technologies, LLC ("Ascension"), two entities formed under the laws of the Lac Vieux Band of Chippewa Indians for the sole purpose of making illegal loans and avoiding state and federal law through the artifice of immunity created by the rent-a-tribe scheme.

---

[1] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

12.     Plaintiffs, on behalf of themselves and the Classes set forth below, seek to recover damages and penalties under state and federal law for Defendants' illegal and usurious loans.

## JURISDICTION AND VENUE

13.     The Court has original jurisdiction over Plaintiffs' Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1965 and 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

14.     The Court also has jurisdiction under the Class Action Fairness Act because Plaintiffs are citizens of Virginia, California, Florida, Illinois, Indiana, Maryland, New Jersey, North Carolina, Texas, Ohio, and Washington, at least one Defendant is not a citizen of any of those states, the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

15.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District.  Venue is also proper in this Court pursuant to 18 U.S.C. § 1965(a) because a civil action may be brought in a district court for "any district" where a person "resides, is found, has an agent, or transacts his affairs."  18 U.S.C. § 1965(a).  Defendants have transacted their affairs in this District through the nationwide scheme, which collected millions of dollars from Virginia consumers.  As part of their scheme, Defendants solicited Virginia consumers with direct mails, debited Virginia consumers' bank accounts, and serviced the illegal loans of thousands of Virginia consumers.

## PARTIES

16.     Plaintiff Renee Galloway is a natural person who resides in this District and Division.

17.     Plaintiff Dominque de la Bay is a natural person who previously resided in

4

Alexandria, Virginia.

18.     Plaintiff Andrea Scarborough is a natural person who resides in Portsmouth, Virginia.

19.     Plaintiff Dianne Turner is a natural person who resides in Rocky Mountain, Virginia.

20.     Plaintiff Earl Browne is a natural person who resides in Burbank, California.

21.     Plaintiff Rose Marie Buchert is a natural person who resides in Rockford, Illinois.

22.     Plaintiff Regina Nolte is a natural person who resides in Indianapolis, Indiana.

23.     Plaintiff Kevin Minor is a natural person who resides in Toledo, Ohio.

24.     Plaintiff Teresa Titus is a natural person who resides in Ridgefield, Washington.

25.     Plaintiff Burry Pough is a natural person who resides in Texas.

26.     Plaintiff Lisa Martinez is a natural person who resides in Texas.

27.     Plaintiff Sonji Grandy is a natural person who resides in New Jersey.

28.     Plaintiff Anastasia Sherman is a natural person who resides in Florida.

29.     Plaintiff Jerry Avent is a natural person who resides in North Carolina.

30.     Plaintiff Lucinda Gray is a natural person who resides in North Carolina.

31.     Plaintiff Anthony Green is a natural person who resides in Illinois.

32.     Plaintiff Linda Madison is a natural person who resides in Maryland.

33.     Defendant Matt Martorello is a natural person and resident of Puerto Rico. Martorello was the founder and chief executive officer of Bellicose Capital, which Martorello created to make and collect the usurious loans described herein.  As explained below, Martorello was the architect of the rent-a-tribe lending scheme and had direct personal involvement in the creation and day-to-day operations of the illegal enterprise.

34.     Defendant Big Picture Loans, LLC is a purported tribal entity incorporated under the laws of the Lac Vieux Desert Band of Lake Superior Chippewa Indians ("the Tribe") and located in Watersmeet, Michigan.  Big Picture operates a business as an internet lending website under the domain name www.bigpictureloans.com.  In return for a small fraction of the revenue, the Tribe allowed the lending scheme to use its name and falsely claim that the scheme is operated by the Tribe.  At all times relevant hereto, the Tribe did not participate in the day-to-day operations of Big Picture and did not fund the loans or handle the servicing or collection of the loans.  Big Picture was formerly known as Red Rock Tribal Lending, LLC, which did business under the domain name www.castlepayday.com.  Big Picture is the successor-in-interest of Red Rock.

35.     Defendant Ascension Technologies, LLC, f/k/a Bellicose Capital is a limited liability company previously organized under the laws of the U.S. Virgin Islands and then Puerto Rico.  Bellicose Capital was formed by Martorello in 2011 to make the usurious loans to consumers in violation of state law.  Although Defendants held it out as a "managing consulting company," Bellicose Capital was the actual entity that procured the investment capital, serviced the loans, and received the vast majority of the revenue from the loans, which was then funneled to Martorello.  Due to various lawsuits against Martorello's competitors and anticipated regulation from the Consumer Financial Protection Bureau ("CFPB"), Martorello transferred Bellicose to the Tribe in January 2016 in an attempt to shield Bellicose Capital's illegal business practices.  The Tribe rebranded Bellicose as Ascension Technologies, which continues to operate with no tribal involvement or benefit to the Tribe.

## SERVICE ON THE ATTORNEY GENERAL

36.     Counsel for Plaintiffs are causing a copy of this pleading to be served contemporaneously with this filing on the Attorney General of Washington in accordance with RCW 19.86.095, and on the Attorney General of Illinois in accordance with 815 ILCS 505/10a(d).

## STATE USURY AND CONSUMER PROTECTION LAWS[2]

### A. Virginia

37.     Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984).   The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *Id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

38.     In accordance with this longstanding public policy, Virginia's Consumer Finance Act prohibits a person from charging an annual percentage rate ("APR") exceeding 12% without first obtaining a consumer finance license from the Commonwealth.  Va. Code §§ 6.2-1501(A), 6.2-303(A).   The consumer finance licensing requirements are designed to protect Virginia consumers from predatory lenders like Defendants.

39.     Defendants were never licensed to lend in Virginia.

---

[2] Usury laws are not unique to the United States of America.  Indeed, about "a dozen Biblical passages suggest that usurious lending, especially to the poor, is a grave sin."  Christopher L. Peterson, *"Warning: Predatory Lender"—A Proposal for Candid Predatory Small Loan Ordinances*, 69 Wash & Lee L. Rev. 893, 896 n.9 (2012).  Echoing these sentiments, Pope Francis recently explained that "Usury is a serious sin: it kills life, tramples on the dignity of people, is a vehicle for corruption and hampers the common good. It also weakens the social and economic foundations of a country."  Pope Francis, Address to National Anti-Usury Council (Feb. 3, 2018), available at https://zenit.org/articles/pope-francis-usury-humiliates-and-kills.

40.     The Virginia General Assembly has expressly declared that any attempt to circumvent usury laws is "against public policy and void."  Va. Code. § 6.2-306(A) ("Any agreement or contract in which the borrower waives the benefits of this chapter or releases any rights he may have acquired under this chapter shall be deemed to be against public policy and void.").  This includes attempts to evade the application "by any device, subterfuge, or pretense whatsoever," including "procurement of a loan through any use or activity of a third person, whether real or fictitious."  Va. Code. § 6.2-1541(C).

41.     Any loan made in violation of Virginia's usury laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made."  Va. Code § 6.2-1541(A)-(B).

**B.  California**

42.     Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872.  Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

43.     Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money."  *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

44.     Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan." *Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

8

45.     "An interest rate in excess of 10% is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Id.*

46.     California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *See id.* at 1166 (quoting *Fox v. Peck Iron and Metal Co., Inc.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

47.     Thus, California law allows borrowers to recover all interest paid on the loans in excess of 10% within the past two years, plus treble damages for any interest paid within the year preceding the filing of this action and their attorney's fees and costs.  Cal. Civ. Code § 1916-3; *Dev. Acquisition Group*, 776 F. Supp. 2d at 1165; Rickett, *supra*, at 1391.

48.     Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices.  Cal. Bus. & Prof. Code § 17200.

## C.  Illinois

49.     Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'" means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less.  205 ILCS 670/15.

50.     Small consumer loan lenders are required to be licensed to make loans.  205 ILCS 670/1.  A licensed lender may charge interest rates up to 99%.  *See* 205 ILCS 670/17.2(a)(1), (b)(3).

51.     If a lender is unlicensed, annual interest is capped at 9%: "[I]n all written contracts it shall be lawful for the parties to stipulate or agree [to] 9% per annum, or any less sum of interest." *See* 815 ILCS 205/4(1).

9

52.    If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

53.    Through a civil action, a borrower can sue a lender for violating the Illinois Consumer Installment Loan Act "prior to the expiration of 2 years after the date of his last scheduled payment" to reduce the balance by the amount that the lender is entitled to recover, and to recover attorneys' fees and costs.  205 ILCS 670/20(b); 205 ILCS 670/20.7.

54.    The Illinois Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce.  815 ILCS 505/2; 815 ILCS 550/10a.

55.    Defendants were never licensed to lend in Illinois.

**D. Indiana**

56.    In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana.  Ind. Code § 24-4.5-3-502.  A separate license is required for making small loans of less than $550.  *Id.*  If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

57.    Defendants were never licensed to lend in Indiana.

58.    Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150.  Ind. Code § 24-4.5-7-201.  For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

(a) the total of:

> (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;
>
> (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
>
> (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or
>
> (b) twenty-five percent (25%) per year on the unpaid balances of the principal.

Ind. Code § 24-4.5-3-508.

59.     "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt."  Ind. Code § 24-4.5-5-202.

60.     In addition to these penalties, debtors on small loans are also entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees."  Ind. Code § 24-4.5-7-409.

**E. Ohio**

61.     "The [legislature's] right to regulate the rate of interest by law is as old as government itself."  *Wessell v. Timberlake*, 116 N.E. 43, 46 (Ohio 1916).

62.     Ohio law generally caps interest rates at 8% per annum.  Ohio Rev. Code § 1343.01(A).

63.     Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less.  Ohio Rev. Code § 1321.02.  For loans between $1,000 and $5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000.  Ohio Rev. Code § 1321.13(A).  Defendants were never licensed to lend in Ohio.

11

64.     Any lender who charges interest rates in excess of those provided by law "shall forfeit to the borrower twice the amount of interest contracted for." Ohio Rev. Code § 1321.14(D).

65.     Lenders licensed under Ohio's Short-Term Loans Law may charge interest rates no greater than 28% APR on loans of $500 or less. Ohio Rev. Code § 1321.35–40. Licensees must be located in Ohio. Ohio Rev. Code § 1321.36.

66.     Any interest charged in excess of 28% APR on loans of $500 or less is deemed an unfair or deceptive business practice in violation of Ohio's Consumer Sales Practices Act. Ohio Rev. Code §1321.44(A). A short-term borrower injured by excessive interest rates "shall have a cause of action and be entitled to the same relief available to a consumer under [the CSPA]." Ohio Rev. Code §1321.44(A).

67.     Ohio's Consumer Sales Practices Act allows injured borrowers to "recover [their] actual economic damages plus an amount not exceeding five thousand dollars in noneconomic damages." Ohio Rev. Code § 1345.09(A).

68.     Defendants were never licensed to lend in Ohio.

**F. Washington**

69.     Washington's usury laws were "enacted in order to protect the residents of this state from debts bearing burdensome interest rates" and "in recognition of the duty to protect our citizens from oppression." RCW 19.52.005.

70.     In Washington, the maximum allowable interest rate is twelve percent per annum. RCW 19.52.020(1); *see also* RCW 19.52.025; State Maximum Interest Rate, *available at* http://leg.wa.gov/CodeReviser/Documents/rates.htm. "No person shall directly or indirectly take or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action." RCW 19.52.020(1).

71.     If interest greater than the statutory maximum of twelve percent is directly or indirectly contracted for, received, or reserved, the contract is usurious.  RCW 19.52.030.

72.     If a usurious interest rate is charged, the creditor shall be entitled to collect only the principal amount of the loan, less the amount of interest accruing thereon, and if any interest was actually paid, the creditor shall be entitled to collect only the principal amount less twice the amount of the interest paid and less the amount of all accrued by unpaid interest.  RCW 19.52.030. A plaintiff may seek application of these statutory penalties by bringing an action under RCW 19.52.032.

73.     RCW Chapter 19.52 applies to loans made to any person residing in Washington at the time the loan was made, regardless of the location where the loan was made.  RCW 19.52.034.

74.     In addition to a statutory usury claim entitling a plaintiff to recover the penalties provided in RCW 19.52.030, entering into or transacting a usurious contract constitutes a per se unfair act or practice in the conduct of commerce for purposes of establishing a claim under the Washington Consumer Protection Act.  RCW 19.52.036.

**G. Texas**

75.     Subject to limited exceptions, the maximum rate of interest allowed in Texas is 10%.  Tex. Fin. Code § 302.001.

76.     Texas law requires persons issuing consumer loans to obtain a license.  Tex. Fin. Code § 342.051.  Licensees may exceed the 10% maximum interest rate for consumer loans not secured by real property, depending on the type of loan and subject to calculations made by the Consumer Credit Commissioner.  *Id.* § 342.201.

77.     Creditors who charge more than 10% in interest in violation of Texas's Finance Code are liable for the greater of (1) three times the amount of interest charged in excess of 10%, or (2) the lesser of $2,000 or 20 percent of the principal.  Tex. Fin. Code § 305.001.

78.     Additionally, if the interest charged and received is more than twice the permissible amount, the creditor will be held liable for the principal amount, the interest, and any other charges or fees.  Tex. Fin. Code § 305.002.

79.     Defendants were never licensed to make loans to Texas consumers.

**H.  Florida**

80.     In Florida, the maximum allowable rate of interest on loans of $500,000 or less is eighteen percent (18%).  Fla. Stat. § 687.03.

81.     Florida makes it either a misdemeanor or felony—depending on the interest rate— to charge usurious interest in excess of twenty-five percent (25%).  Fla. Stat. § 687.071.  Loan contracts in excess of the 25% threshold triggering criminal liability for usury are "therefore void as against the public policy of the state as established by its Legislature."  *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

82.     Lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable.  Fla. Stat. § 516.02(1-2).

83.     Defendants were never licensed to make consumer loans in Florida.

84.     Under Florida law, consumers can recover twice the amount of usurious interest paid made on illegal loans.  Fla. Stat. § 687.04.

**I.  New Jersey**

85.     The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a).  Charging consumers a rate of interest greater than 30% is a criminal act under New Jersey law.  N.J. Stat. § 2C:21-19.

86.     The New Jersey Consumer Finance Licensing Act ("CFLA") governs the provision of installment loans to consumers in New Jersey and allows *licensed* lenders to charge interest higher than 16% for installment loans under $50,000.  N.J. Stat. §§ 17:11C-1 to 17:11C-49.

87.     The CFLA provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree."  N.J. Stat. § 17:11C-33(b).  The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…."  *Id.*

88.     Defendants were never licensed to make consumer loans in New Jersey.

89.     The New Jersey Consumer Fraud Act also provides a remedy for consumers who are the victims of unfair or deceptive acts or practices in trade or commerce.  N.J. Stat. § 56:8-2.

**J.  North Carolina**

90.     In North Carolina, the legal interest rate chargeable to consumers is 8%.  N.C. Gen. Stat. § 24-1.

91.     Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%.  N.C. Gen. Stat. § 24-1.1(c).

92.     Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest.  N.C. Gen. Stat. § 24-2.  If the interest has been paid, the borrower may recover twice the amount of interest paid.  *Id.*

93.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner.  N.C. Gen. Stat. §§ 53-166(a), 53-168.

94.     Unlicensed venders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor.  N.C. Gen. Stat. § 53-166(c).  Additionally, the entire loan becomes void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan."  *Id.* § 53-166(d).

95.     Defendants were never licensed to make consumer loans in North Carolina.

## K. Maryland

96.     Maryland law, Md. Code, Com. Law § 12-306, prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan.

97.     Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation.  Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204.  Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection."  Defendants have never been licensed to make loans in Maryland.

98.     Because Defendants violated Maryland's licensing and interest rate requirements, it was unlawful for any person, including Defendants, to collect or receive any interest, fees, or charges on the loans.  Md. Code, Com. Law § 12-314.

99.     For willful violations, like those committed here, Maryland law allows consumers to recover principal, interest, or other compensation paid to Defendants with respect to all loans. Md. Code, Com. Law § 12-313.

## DEFENDANTS' SCHEME TO AVOID STATE USURY AND CONSUMER PROTECTION LAWS

100.     Defendants operate a rent-a-tribe scheme that charges more than 400% annual interest on short term loans.

101.     The architect of the scheme is Matt Martorello, a Chicago entrepreneur and non-tribal member who owned Bellicose Capital.  With the assistance of Martorello and Bellicose, several tribal officials helped form two "business enterprises" of the Tribe—the companies Big Picture and Red Rock Tribal Lending, LLC ("Red Rock")—that each claimed to be "wholly owned" and "operated as an instrumentality of the Tribe."

102.     Starting in 2011, Martorello began offering high interest loans through these companies.  Red Rock operated using the website www.castlepayday.com.  Big Picture is the successor-in-interest to Red Rock and operates using the website www.bigpictureloans.com.

103.     The Tribe and Tribal entities received only 2% of profits from the loans, while Martorello and his companies, including Bellicose Capital, reaped nearly all of the profits and provided the resources to market, fund, underwrite, and collect on the loans.  *See* Delvin D. Hawley, *Payday Lenders on the Run*, Bloomberg Business Week (Feb. 8, 2016) ("Matt Martorello's company, Bellicose Capital, helps an American Indian tribe in Michigan run websites

that offer small loans to the public at annualized interest rates as high as 780 percent. The tribe gets 2 percent of the revenue, while Martorello makes millions.").

104.     Bellicose Capital procured the investment capital, serviced the loans, and received most of the revenue from the loans.  Bellicose also provided lead generation, technology, payment processing, and collection services for the loans.  Bellicose provided these services with non-tribal employees located outside of the Lac Vieux Reservation.

105.     The Tribe has no control over the income or expenses of either Red Rock or Big Picture.

106.     Tribal members provide minimal assistance in the day-to-day operations of Red Rock and Big Picture, and nearly all the activities associated with these companies occurred off the Lac Vieux Reservation, such as the call centers, payment processing, and servicing of the loans.

107.     Despite representations in the loan agreements that Big Picture and Red Rock were owned and operated by the Tribe, Bellicose Capital was the *de facto* owner and controlled the operations of Big Picture and Red Rock.

108.     Moreover, nearly all activities performed on behalf of Big Picture and Red Rock were performed by officers and employees of Bellicose who were not located on the Lac Vieux Reservation.  Instead, they were Bellicose Capital employees located in the Virgin Islands, Puerto Rico, and the Philippines.

109.     Bellicose Capital also handled the lead generation used to identify and solicit potential consumers.[3]

---

[3] In order to find potential customers, internet lenders pay companies known as "lead generators," which are businesses that collect information on potential consumers to solicit for high-interest loans.  Pew Charitable Trust, *Fraud and Abuse Online: Harmful Practices in Internet Payday Lending* (Oct. 2014), https://bit.ly/2sIErJG.  Lead generators pay high fees to several sources, such as consumer reporting agencies, to acquire borrower information to determine

110.    For example, Bellicose Capital procured consumer reports from Trans Union in an attempt to identify consumers who may be susceptible to, or in need of, a loan.

111.    If a consumer's report showed that he or she may be susceptible to a high-interest loan, then Bellicose Capital sent direct mailings to the home of the consumer stating that he or she was pre-approved, that the loan was "a smarter way to borrow," and that funds can be deposited "as early as tomorrow."

112.    If a consumer called the number on the letter, he or she would reach a call center in the Philippines, who took direction and instructions from Bellicose Capital and not the Tribe.

113.    In the past few years, regulators have begun cracking down on rent-a-tribe arrangements.

114.    In 2013, the New York Department of Financial Services issued a cease and desist order to Red Rock, requesting that Red Rock cease providing loans to New York residents.

115.    In response, Red Rock filed a lawsuit seeking a preliminary injunction against the New York Department of Financial Services.  The district court denied the motion for preliminary injunction and the Second Circuit affirmed the decision, finding that the loans were subject to New York's anti-usury laws.  *See Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105 (2d Cir. 2014).

116.    At this time, the Federal Trade Commission brought suit against a similar rent-a-tribe scheme operated by Scott Tucker and Timothy Muir.  The FTC obtained a $1.3 billion dollar

---

whether a consumer has ever applied for or received an internet loan or whether a consumer may be in need of or qualify for an additional loan.  *Id.*

judgment, and Tucker and Muir were convicted in the Southern District of New York on racketeering charges.[4]

117.    Just like Tucker and Muir, Defendants' business relationship with the Tribe was nothing more than an attempt to mislead consumers and regulators by creating the illusion that the Defendants were protected by tribal immunity.

118.    After several of these rent-a-tribe schemes were uncovered through private lawsuits and governmental enforcement actions against Defendants' competitors, Martorello "sold" Bellicose Capital to the Tribe in an effort to further insulate the scheme from liability. Bellicose was rebranded as Ascension Technologies, LLC.

119.    As part of this arrangement, the Tribe paid Martorello $1.3 million. In addition, the Tribe agreed to pay him as much as $300 million in future payments. In other words, the Tribe continues to accept a nominal fee in return for the use of its name.

120.    And while it is now nominally organized under the laws of the Tribe, Ascension continues to be operated in the same manner and by the same individuals who ran Bellicose Capital—none of whom are affiliated with the Tribe.

121.    For example, approximately 20 individuals identify Ascension as their employer on LinkedIn. However, none of these people are located on the Tribe's Reservation. Instead, many of them list Atlanta, Mississippi, or Puerto Rico as the place where they are located. None of these people appear to be members of the Tribe, and nearly all of the activities of Ascension are performed by these non-Tribal members who are not located on the Reservation.

---

[4]    *See*   https://www.ftc.gov/news-events/blogs/business-blog/2016/10/record-13-billion-ruling-against-scott-tucker-others-behind;   https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday.

122.    Ascension is also registered to do business in Puerto Rico.   Because of its registration as a foreign corporation, Ascension has "the same rights, privileges, duties, restrictions, penalties, and responsibilities" as a domestic corporation formed under the laws of Puerto Rico.  *See* 14 L.P.R.A. § 3806.  This includes the power to "[s]ue and be sued under its corporate name *in any court*. . . ."  14 L.P.R.A. § 3522 (emphasis added).

123.    Big Picture employs only a handful of Tribal employees and the majority of its employees are non-Tribal members.  The Tribal employees perform clerical tasks and respond to consumer emails using pre-approved templates.

124.    The Tribe receives little benefit from its "ownership" of Ascension and Big Picture.

125.    In other litigation, Big Picture has stated that it "does not make a profit for itself" and that Ascension "does not make money."

126.    Big Picture receives a flat fee of 3% from the net profits of the loans.

127.    In 2014 and 2017, the Washington Department of Financial Institutions issued a warning to consumers that Big Picture, along with other lenders associated with the Lac Vieux Desert Band of Lake Superior Chippewa Indians, were not licensed in the state of Washington or registered to conduct business in Washington.[5]

## PLAINTIFFS' EXPERIENCES

### A.  Plaintiff Renee Galloway (Virginia)

128.    On or around April 21, 2017, Plaintiff Galloway obtained a loan for $600 with Big Picture that had an interest rate of 636.75%.

---

[5]  *See*  https://dfi.wa.gov/consumer/alerts/lac-vieux-desert-lvd-band-tribe-community-not-licensed-washington.

129.    Plaintiff Galloway paid $930 on her loan with Big Picture, almost all of which was credited to interest and fees.

130.    As part of her application, Plaintiff Galloway entered in her Virginia residential address.

**B. Plaintiff Dominque de la Bay (Virginia)**

131.    On or around July 4, 2017, Plaintiff de la Bay obtained a loan for $1,025.00 with Big Picture that had an interest rate of 482.12%.

132.    Plaintiff de la Bay paid more than $500 on her loan with Big Picture, almost all of which was credited to interest and fees.

133.    As part of her application, Plaintiff de la Bay entered in her Virginia residential address, located in Alexandria, Virginia.

**C. Plaintiff Andrea Scarborough (Virginia)**

134.    On or around May 10, 2018, Plaintiff Scarborough obtained a loan for $750.00 with Big Picture that had an interest rate of 492.18%.

135.    Plaintiff Scarborough also obtained a loan with Big Picture in early 2017 that had a similar interest rate.

136.    Plaintiff Scarborough paid more than $200 on her 2017 loan with Big Picture.

137.    Plaintiff Scarborough paid more than $200 on her 2018 loan with Big Picture, almost all of which was credited to interest and fees.

138.    As part of her application, Plaintiff Scarborough entered in her Virginia residential address.

**D.  Plaintiff Dianne Turner (Virginia)**

139.    On October 12, 2015, Plaintiff Turner obtained a $400 loan with Red Rock that had an interest rate of 615%.

140.    Plaintiff Turner paid no less than $560 on her loan with Red Rock, almost all of which was credited to interest and fees.

141.    As part of her application, Plaintiff Turner entered in her Virginia residential address.

**E.  Plaintiff Earl Browne (California)**

142.    On February 2, 2017, Plaintiff Browne obtained a loan with Big Picture that had an interest rate of 697%.

143.    Plaintiff Browne paid no less than $1,124.09 on his loan with Big Picture within the past year, most of which was credited to interest and fees.

144.    As part of his application, Plaintiff Browne entered in his California residential address.

**F.  Plaintiff Rose Marie Buchert (Illinois)**

145.    On October 9, 2015, Plaintiff Buchert applied for a $250 loan from Red Rock.  The loan had an interest rate of 755%, requiring monthly payments with a final payment due on August 3, 2016.  The finance charge was $1,000.

146.    In October 2016, Plaintiff Buchert took out a second loan that was identical in amount, interest rate, and payment plan to her first loan.

147.    As part of her applications, Plaintiff Buchert entered in her Illinois residential address.

148.    Plaintiff Buchert paid off both loans, including $2,000 in finance charges.

### G.  Plaintiff Anthony Green (Illinois)

149.    On or around January 9th, 2018, while living in Illinois, Plaintiff Green took out a loan from Big Picture.

150.    The principal amount on the loan was $400.00 and the interest rate was 683.36%. This loan required 13 bi-weekly payments of $116.67.

151.    Plaintiff Green made approximately seven payments and paid at least $800.00 to Big Picture for repayment on the loan.

152.    As part of his application, Plaintiff Green entered in his Illinois residential address.

### H.  Plaintiff Regina Nolte (Indiana)

153.    Plaintiff Nolte took out a $450 loan from Big Picture that was deposited into her account on December 20, 2016.  The interest rate on the loan was at least 200%.

154.    As part of her application, Plaintiff Nolte entered her Indiana residential address.

155.    Plaintiff Nolte paid Big Picture in excess of the principal amount on her loan.

### I.  Plaintiff Kevin Minor (Ohio)

156.    On or about May 5, 2016, Plaintiff Minor received a $900 loan from Big Picture. The loan had an annual interest rate that exceeded 44%.

157.    On or about August 4, 2016, Plaintiff Minor received a $1,000 loan from Big Picture.  The loan had an annual interest rate that exceeded 56%.

158.    Plaintiff Minor made multiple payments on his loans, and paid off at least one of his loans with Big Picture in full.

159.    As part of his loan applications, Plaintiff Minor entered his Ohio address.

### J.  Plaintiff Teresa Titus (Washington)

24

160.    On or about July 14, 2015, Plaintiff Titus applied for a loan at www.castlepayday.com.  Plaintiff Titus was approved for a loan for $400.00.  The loan had an annual interest rate over 400%.

161.    On July 14, 2015, $400 was deposited into her bank account by "Castle Payday.com."

162.    By June 2016, Plaintiff Titus had paid a total of $2,281.25 on her July 2015 loan. But when she could no longer afford her payments on the loan, she had to take out another loan to cover her payments on the first loan.  Over the course of the next year, Plaintiff Titus suffered from this debt treadmill whereby she had to take out new loans in order to pay back old loans.

163.    In addition to her original loan, Plaintiff Titus took out loans from Defendants in June 2016 ($500) and July 2017 ($400).  These loans both had annual interest rates in excess of 400%.  These loans were deposited into Plaintiff Titus's bank account by "VBS Big Picture Loans" and "Big Picture Loans," respectively.

164.    Since August 2015, Plaintiff Titus has paid $4,994.11 to Defendants toward her $1,300 principal in Castle Payday/Big Picture loans.  Plaintiff Titus has also paid $175 in overdraft fees and returned item charges associated with automatic bank account debits for her Castle Payday/Big Picture payments.

165.    As part of her application for these loans, Plaintiff Titus entered in her Washington residential address.

166.    As of the filing of the initial complaint in the matter, Defendants are still attempting to collect additional payments from Plaintiff Titus.

**K.  Plaintiff Burry Pough (Texas)**

167.     On or around November 28, 2017, while living in Texas, Plaintiff Pough took out a loan from Big Picture.

168.     The principal amount on the loan was $800.00 and the interest rate was 598.3569%. The loan required 20 bi-weekly payments of about $179.58.  Plaintiff paid at least $2,873.28 to Big Picture for repayment on the loan.

169.     As part of the loan application, Plaintiff Pough provided his Texas address.

170.     Defendants are still attempting to collect on the loan.

**L.  Plaintiff Lisa Martinez (Texas)**

171.     On or around October 19, 2017, while living in Texas, Plaintiff Lisa Martinez took out a loan from Big Picture.

172.     The principal amount on the loan was $800.00 and the interest rate was at least 320%.  The loan required 13 bi-weekly payments of about $211.16.

173.     Plaintiff Martinez paid off the loan in full prior to the loan maturity date, and paid at least $2,598.28 to Big Picture for repayment on the loan.

174.     As part of the loan application, Plaintiff Martinez provided her Texas address.

**M. Plaintiff Anastasia Sherman (Florida)**

175.     On or around April 21, 2016, while living in Florida, Plaintiff Sherman took out her first loan from Big Picture.

176.     The principal amount on the loan was $400.00 and the interest rate was 569.2071%. Plaintiff Sherman paid off well above the principal balance of the loan.

177.     On or around October 20, 2017, still while living in Florida, Plaintiff Sherman took out her second loan from Big Picture.

178.    The principal amount on the loan was $425.00 and the interest rate was 497.6327%. The loan required 13 bi-weekly payments of about $85.45.   Plaintiff Sherman paid at least $1,110.66 to Big Picture for repayment on the second loan.

179.    As part of the loan applications, Plaintiff Sherman provided her Florida address.

## N.  Plaintiff Sonji Grandy (New Jersey)

180.    On or around January 19, 2017, while living in New Jersey, Plaintiff Grandy took out a loan from Big Picture.

181.    The principal amount on the loan was $600.00 and the interest rate was 720.03%. This loan required 28 bi-weekly payments varying from $62.50-$150.00.

182.    Plaintiff Grandy paid at least $3,000 to Big Picture for repayment on the loan.

183.    As part of the loan application, Plaintiff Grandy provided her New Jersey address.

## O.  Plaintiff Jerry Avent (North Carolina)

184.    In or around December 2017, while living in North Carolina, Plaintiff Avent took out a loan from Big Picture.

185.    The principal amount on the loan was $200.00 and the interest rate was between 564.392%.

186.    Plaintiff Avent has paid around $700 on the loan, including $653.69 that has been credited to interest.

187.    As part of the loan application, Plaintiff Avent provided his North Carolina address.

## P.  Plaintiff Lucinda Gray (North Carolina)

188.    On or around December 10, 2017, while living in North Carolina, Plaintiff Gray took out a loan from Big Picture.

189.     The principal amount on the loan was $600.00 and the interest rate was 598.7874%. The loan required 12 monthly payments of about $264.27.

190.     Plaintiff Gray paid at least $2,114.16 to Big Picture for repayment on the loan.

191.     As part of the loan application process, Plaintiff Gray entered in her North Carolina address.

**Q. Linda Madison (Maryland)**

192.     On or around March 6, 2018, Plaintiff Madison obtained an $800 loan with Big Picture that had an interest rate of 665%.

193.     Plaintiff Madison obtained the loan over the internet when she was in Maryland, and her loan application originated in Maryland.

194.     Plaintiff Madison paid no less than $880.92 on her loan with Big Picture—most of which was credited to interest and fees.

## CLASS ACTION ALLEGATIONS

195.     Plaintiffs Galloway, Turner, de la Bay, and Scarborough assert their Virginia claims on behalf of the proposed Virginia Class defined as follows:

> *All individuals located in Virginia who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

196.     Plaintiff Browne asserts his California claims on behalf of the proposed California Class defined as follows:

> *All individuals located in California who entered into a loan agreement with Big Picture or Red Rock and paid any amounts on the loan.*

197.    Plaintiffs Buchert and Green asserts their Illinois claims on behalf of the proposed

Illinois Class defined as follows:

> *All individuals located in Illinois who entered into a loan agreement*
>
> *with Big Picture or Red Rock and paid any amounts on the loan.*

198.    Plaintiff Nolte asserts her Indiana claims on behalf of the proposed Indiana Class

defined as follows:

> *All individuals located in Indiana who entered into a loan*
>
> *agreement with Big Picture or Red Rock and paid any amounts on*
>
> *the loan.*

199.    Plaintiff Minor asserts his Ohio claims on behalf of the proposed Ohio lass defined

as follows:

> *All individuals located in Ohio who entered into a loan agreement*
>
> *with Big Picture or Red Rock and paid any amounts on the loan.*

200.    Plaintiff Titus asserts her Washington claims on behalf of the proposed Washington

Class defined as follows:

> *All individuals located in Washington who entered into a loan*
>
> *agreement with Big Picture or Red Rock and paid any amounts on*
>
> *the loan.*

201.    Plaintiffs Pough and Martinez assert their Texas claims on behalf of the proposed

Texas Class defined as follows:

> *All individuals located in Texas who entered into a loan agreement*
>
> *with Big Picture or Red Rock and paid any amounts on the loan.*

202.     Plaintiff Sherman asserts her Florida claims on behalf of the proposed Florida Class defined as follows:

> *All individuals located in Florida who entered into a loan agreement*
>
> *with Big Picture or Red Rock and paid any amounts on the loan.*

203.     Plaintiff Grandy asserts her New Jersey claims on behalf of the proposed New Jersey Class defined as follows:

> *All individuals located in New Jersey who entered into a loan*
>
> *agreement with Big Picture or Red Rock and paid any amounts on*
>
> *the loan.*

204.     Plaintiffs Gray and Avent assert their North Carolina claims on behalf of the proposed North Carolina Class defined as follows:

> *All individuals located in North Carolina who entered into a loan*
>
> *agreement with Big Picture or Red Rock and paid any amounts on*
>
> *the loan.*

205.     Plaintiff Madison asserts her Maryland claims on behalf of the proposed Maryland Class defined as follows:

> *All individuals located in Maryland who entered into a loan*
>
> *agreement with Big Picture or Red Rock and paid any amounts on*
>
> *the loan.*

206.     Plaintiffs also assert claims on behalf of the proposed RICO Class defined as follows:

*All individuals located in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, or states with similar laws who entered into a loan agreement with Big Picture or Red Rock.*

**Numerosity**

207.    At this time, Plaintiffs do not know the exact number of members of the Classes; however, given the volume of Defendants' business, there are likely thousands of members of each Class.  Thus, the Classes are so numerous that joinder of all members is impracticable.

**Commonality**

208.    There are numerous common questions of law and fact common to Plaintiffs and members of the Classes.  These questions include but are not limited to the following:

a.    Whether Defendants violated state usury laws;

b.    Whether Defendants are protected by tribal sovereign immunity;

c.    Whether Defendants engaged in unfair or deceptive acts or practices;

d.    Whether Defendants, Bellicose Capital, Source Point, the Tribal officials, and others unknown to Plaintiffs, constitute an "enterprise" under RICO;

e.    Whether Defendants conducted the affairs or participated in the enterprise's affairs;

f.    Whether Defendants violated RICO by charging interest rates more than twice the legal limit under state law; and

g.    The proper measure and amount of damages for the Classes.

**Typicality**

31

209.    Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Each Plaintiff, like members of the Classes, took out a usurious loan from Defendants.   Thus, Plaintiffs' claims, like the claims of the Classes, arise out of the same common practices of conduct by Defendants and are based on the same legal and remedial theories.

**Adequacy**

210.    Plaintiffs will fairly and adequately protect the interests of the Classes.   Plaintiffs have competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience in litigating rent-a-tribe cases. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so.   Neither Plaintiffs nor their counsel have interests that conflict with the Classes.

**Injunctive Relief**

211.    The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole.   Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**Predominance and Superiority**

212.    The Classes meet the requirements for certification to seek monetary relief under Fed. R. Civ. P. 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.   Additionally, individual actions

may be dispositive of the interests of members of the Classes even though certain members of the

Classes are not parties to such actions.  Further, a class action is superior to other available methods

for the fair and efficient adjudication of the controversy, for at least the following reasons:

    a.    Absent a class action, class members as a practical matter will be unable to obtain redress; Defendants' violations will continue without remedy; and additional consumers will be harmed.

    b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

    c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

    d.    The lawsuit presents no difficulties that would impede its management by the Court as a class action.

    e.    Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. §§ 1962(c) & (d)**
**(On behalf of all Plaintiffs and the RICO Class)**

213.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

214.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

215.    The Enterprise, consisting of each named Defendant and the unnamed officers, executives, and other employees of Big Picture and Ascension, together with Bellicose Capital and Source Point, are an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the

common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through the online lender Castle Payday, later known as Big Picture.

216.    The Enterprise has an ongoing organization with an ascertainable structure, and functions as a continuing unit with separate roles and responsibilities.

217.    Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

218.    RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate."  18 U.S.C. § 1961(6).

219.    All of the loans made to RICO Class members and collected by Defendants included interest rates far in excess of twice the enforceable rate in their states.

220.    Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt.  Each Defendant knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

221.    Plaintiffs and RICO Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

222.    This conduct began sometime in 2011, continues to date, and will be repeated again and again in the future to the detriment of consumers in Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, North Carolina, New Jersey, Maryland, and other states with similar usury laws.  Accordingly, Defendants are jointly and severally liable to Plaintiffs and the

RICO Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION
### Violation of Virginia Usury Laws
**(On behalf of Plaintiffs Galloway, de la Bay, Scarborough, Turner ("Virginia Plaintiffs") and the Virginia Class)**

223.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

224.    Under Virginia law, the maximum allowable interest rate on a consumer loan is 12% per annum.  Va. Code § 6.2-303.

225.    All of the loans made to Virginia consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 12%.

226.    As a result, the Virginia Plaintiffs and the Virginia Class are entitled to recover all amounts paid on these void loans, as well as twice the amount of usurious interest repaid.  Va. Code §§ 6.2-1541(B), 6.2-305.

## THIRD CAUSE OF ACTION
### Violation of California Usury Laws
**(On behalf of Plaintiff Browne and the California Class)**

227.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

228.    Under the California Constitution, the maximum allowable interest rate on a consumer loan is 10% per annum.  Cal. Const. Art. XV § 1.

229.    All of the loans made to California consumers in the name of Big Picture and Red Rock used an annual interest rate well in excess of 10%.

230.    Accordingly, Plaintiff Browne and members of the California Class are entitled to recover all interest paid on the loans in excess of 10%, plus treble damages for any interest paid

within the year preceding the filing of this action and their attorneys' fees and costs.  Cal. Civ.

Code § 1916-3.

## FOURTH CAUSE OF ACTION
### Violations of Cal. Bus. & Prof. Code § 17200
### (On behalf of Plaintiff Browne and the California Class)

231.    Plaintiffs reallege and incorporate by reference each and every allegation set forth

in the preceding paragraphs.

232.    As alleged above, Defendants engaged in unlawful, unfair, and deceptive business

practices through the sham relationship with the Tribe in order to make high-interest loans to

consumers throughout the country, including California.

233.    Defendants' conduct violated California's unfair competition laws, Cal. Bus. &

Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices.  Cal.

Bus. & Prof. Code § 17200.

234.    Accordingly, Plaintiff Browne and California Class members are entitled to recover

all interest paid on the loans in excess of 10%, as well as an injunction prohibiting any future

collection of the loans.  Cal. Bus. & Prof. Code § 17203.

## FIFTH CAUSE OF ACTION
### Violation of Illinois Consumer Installment Loan Act - 205 Ill. Comp. Stat. 670/1, et. seq.
### (On behalf of Plaintiffs Buchert, Green ("Illinois Plaintiffs') and the Illinois Class)

235.    Plaintiffs reallege and incorporate by reference each and every allegation set forth

in the preceding paragraphs.

236.    Under the Illinois Consumer Installment Loan Act, a "'[s]mall consumer loan'"

means a loan upon which interest is charged at an annual percentage rate exceeding 36% and with

an amount financed of $4,000 or less.  205 ILCS 670/15.

237.     Small consumer loan lenders are required to be licensed to make loans.  205 ILCS 670/1.

238.     If an unlicensed lender makes a small consumer loan to an Illinois consumer, "the loan shall be null and void and the person who made the loan shall have no right to collect, receive, or retain any principal, interest, or charges related to the loan."  205 ILCS 670/20(d).

239.     Defendants violated Illinois law by charging interest rates making small consumer loans without a license and charging interest rates far in excess of those permitted.

240.     As a result of these unlawful loans, the Illinois Plaintiffs and the Illinois Class are entitled to recover damages, attorneys' fees, and costs pursuant to 205 ILCS 670/20(b); 205 ILCS 670/20.7.

## SIXTH CAUSE OF ACTION
### Violation of Illinois Consumer Fraud Act – 815 ILCS 505/2
### (On behalf of Illinois Plaintiffs and the Illinois Class)

241.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

242.     Defendants, in the course of trade or commerce, engaged in unfair acts and practices, in violation of 815 ILCS 505/2, by contracting for and collecting finance charges, interest, and fees, from Illinois residents, in excess of the amounts permitted by Illinois law.

243.     These unlawful charges caused actual damages to the Illinois Plaintiffs and the Illinois Class.

244.     Pursuant to 815 ILCS 505/10a, the Illinois Plaintiffs and the Illinois Class seek damages for all amounts paid to the Defendants, injunctive relief, and attorneys' fees and costs.

**SEVENTH CAUSE OF ACTION**
**Violation of Indiana Usury Law - Ind. Code § 24-4.5-5-202**
**(On behalf of Plaintiff Nolte and the Indiana Class)**

245.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

246.    In Indiana, with limited exceptions, any entity that makes consumer loans is required to have a license to make such loans in Indiana.  Ind. Code § 24-4.5-3-502.  A separate license is required for making small loans of less than $550.  *Id.*  If a loan is made without a license, the loan is void and the debtor is not obligated to pay either the principal or loan finance charge. Ind. Code §§ 24-4.5-5-202, 24-4.5-7-409.

247.    Even if a lender is properly licensed, the interest on a small loan in Indiana may not exceed 15% for the first $250, 13% for the next $150, and 10% for the last $150.  Ind. Code § 24-4.5-7-201. For all other loans, even licensed lenders may not charge interest that exceeds the equivalent of the greater of:

(a) the total of:

(i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal which is two thousand dollars ($2,000) or less;
(ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and
(iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal which is more than four thousand dollars ($4,000); or

(b) twenty-five percent (25%) per year on the unpaid balances of the principal.

Ind. Code § 24-4.5-3-508.

248.    "If the debtor has paid any part of the principal or of the loan finance charge, the debtor has a right to recover the payment from the person violating this Article or from an assignee

38

of that person's rights who undertakes direct collection of payments or enforcement of rights arising from the debt."  Ind. Code § 24-4.5-5-202.

249.    Defendants made loans in Indiana without a license.

250.    Defendants further made loans to Indiana residents at interest rates well in excess of the rates permitted by Indiana law.

251.    As a result, Plaintiff Nolte and the Indiana Class are entitled to recover all amounts paid on these void loans, as well as interest on amounts paid.

252.    Further, debtors on unlawful small loans of $550 or less are entitled to "actual damages, statutory damages of $2,000 per violation, costs, and attorney's fees," where the conduct did not result from a bona fide computation error.  Ind. Code § 24-4.5-7-409.

### EIGHTH CAUSE OF ACTION
### Violation of Ohio Usury Laws
### (On behalf of Plaintiff Minor and the Ohio Class)

253.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

254.    Under Ohio law, the maximum allowable interest rate on a general loan is 8% per annum.  Ohio Rev. Code § 1343.01(A).

255.    Any usurious interest paid "shall be taken to be payments made on account of principal."  Ohio Rev. Code § 1343.04.

256.    All of the loans made to Ohio consumers in the name of Big Picture and Red Rock contained interest rates in excess of 8% per annum.

257.    As a result, Plaintiff Minor and the Ohio Class are entitled to have any usurious interest charged by Defendants applied to the principal of their loans.  Ohio Rev. Code § 1343.04.

## NINTH CAUSE OF ACTION
### Violation of Ohio Small Loans Law
### (On behalf of Plaintiff Minor and the Ohio Class)

258.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

259.    Lenders licensed under the Small Loans Law may charge interest rates exceeding 8% APR for loans of $5,000 or less.  Ohio Rev. Code § 1321.02.  For loans between $1,000 and $5,000, licensees may charge interest rates no greater than 28% APR on the first $1,000 and 22% on amounts of the principal exceeding $1,000.  Ohio Rev. Code § 1321.13(A).

260.    Any loan made in violation of the Small Loans Law—including any loan under $5,000 made by anyone other than a licensed lender—"is void and the lender has no right to collect, receive, or retain any principal, interest, or charges."  Ohio Rev. Code § 1321.02.

261.    Further, "[a]ny licensee or other person who willfully violates [the Small Loans Law] shall forfeit to the borrower twice the amount of interest contracted for."  Ohio Rev. Code § 1321.14(D).

262.    All of the loans made to Ohio consumers in the name of Big Picture and Red Rock were for amounts under $5,000 and contained interest rates in excess of 28% per annum.

263.    As a result, these loans are void; Defendants have no right to retain any principal, interest, or charges; and Plaintiff Minor and the Ohio Class are entitled to recover twice the amount of usurious interest repaid.  Ohio Rev. Code §§ 1321.02, 1321.14(D).

## TENTH CAUSE OF ACTION
### Violation of Washington Usury Law - RCW 19.52.030
### (On behalf of Plaintiff Titus and the Washington Class)

264.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

265.    Under RCW 19.52.020, the maximum allowable interest rate in Washington has been twelve percent per annum since at least 2004.  *See also* RCW 19.52.025; State Maximum Interest Rate, available at http://leg.wa.gov/CodeReviser/Documents/rates.htm.

266.    A contract is usurious if it provides for a rate of interest higher than the statutory maximum of twelve percent.  RCW 19.52.030(1).

267.    If a contract is usurious, "the creditor shall only be entitled to the principal, less the amount of interest accruing thereon at the rate contracted for; and if interest shall have been paid, the creditor shall only be entitled to the principal less twice the amount of the interest paid, and less the amount of all accrued and unpaid interest; and the debtor shall be entitled to costs and reasonable attorneys' fees plus the amount by which the amount the debtor has paid under the contract exceeds the amount to which the creditor is entitled."  RCW 19.52.030(1).

268.    Defendants entered into usurious contracts with Plaintiff Titus and Washington Class members by charging interest rates well in excess of twelve percent.

269.    Therefore, Plaintiff Titus and Washington Class members are entitled to a declaration that Defendants' loan contracts are usurious.  Plaintiff Titus and Washington Class members are entitled to recover any amounts paid in excess of the amount Defendants are entitled to collect on the loans, pursuant to RCW 19.52.030.

### ELEVENTH CAUSE OF ACTION
#### *Per se* Violation of the Washington Consumer Protection Act –
#### RCW 19.86.020 and RCW 19.52.036
#### (On behalf of Plaintiff Titus and the Washington Class)

270.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

271.    Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

272.    Pursuant to RCW 19.52.036, "[e]ntering into or transacting a usurious contract" is per se "an unfair act or practice in the conduct of commerce for purposes of application of the consumer protection act."

273.    As alleged above, Defendants entered into usurious contracts with Plaintiff Titus and Washington Class members by contracting for interest rates exceeding the statutory maximum of twelve percent.   Thus, Defendants engaged in unfair acts or practices in the conduct of commerce.

274.    Defendants' unfair and deceptive acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law.

275.    Defendants' unfair acts and practices therefore affect the public interest.

276.    As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff Titus and the Washington Class have been injured.  Defendants' conduct has injured the property of Plaintiff Titus and the other class members by charging and collecting interest that they were not legally entitled to charge or collect.

277.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to make loans to Washington residents at usurious interest rates and continue to collect unlawful interest on usurious loans already made to Washington residents.  Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

278.    Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief.  In addition, Plaintiff Titus and

Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

### TWELVTH CAUSE OF ACTION
**Violation of the Washington Consumer Protection Act – RCW 19.86 –
Deceptive Business Practices
(On behalf of Plaintiff Titus and the Washington Class)**

279.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

280.     Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

281.     Defendants engaged in deceptive acts that occurred in trade or commerce by conduct set forth above.  These deceptive acts include the following:

a.     Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

b.     Representing or implying that state law does not apply to Plaintiff Titus's and Washington Class members' loans; and

c.     Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

282.     Defendants' deceptive acts and practices have occurred in trade or commerce.

283.     Defendants' deceptive acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law. Defendants deceived Plaintiff Titus and members of the Washington Class by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim Big Picture and Red Rock are tribal entities not subject to state law.

43

284.     As a direct and proximate result of Defendants' deceptive acts and practices, Plaintiff Titus and the Washington Class have been injured.  Defendants' conduct has injured the property of Plaintiff Titus and the other Washington Class members by charging and collecting interest that they were not legally entitled to charge or collect.

285.     Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to Washington residents.  Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

286.     Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief.  In addition, Plaintiff Titus and Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

### THIRTEENTH CAUSE OF ACTION
**Violation of the Washington Consumer Protection Act – RCW 19.86 –
Unfair Business Practices
(On behalf of Plaintiff Titus and the Washington Class)**

287.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

288.     Plaintiff Titus and Washington Class members are "persons" within the meaning of the Washington Consumer Protection Act, RCW 19.86.010(1).

289.     Defendants engaged in unfair acts that occurred in trade or commerce by conduct set forth above.  These deceptive acts include the following:

      a.      Attempting to avoid application of Washington usury law by improperly using tribal sovereign immunity as a shield for their activities;

      b.      Representing or implying that state law does not apply to Plaintiff Titus's and Washington Class members' loans; and

      c.      Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

290.    Defendants' acts and practices are unfair because they: (1) cause substantial financial injury to Plaintiff Titus and members of the Washington Class; (2) are not outweighed by any countervailing benefits to consumers or competitors; and (3) are not reasonably avoidable by consumers.  Defendants' acts and practices are also unfair because they are immoral, unethical, oppressive and unscrupulous.

291.    Defendants' unfair acts and practices have occurred in trade or commerce.

292.    Defendants' unfair acts or practices have impacted the public interest because they have injured Plaintiff Titus and thousands of Washington residents by charging them interest in excess of the amount allowed by law.  Defendants acted unfairly by representing or implying that they could legally charge interest rates of 400% or more because Defendants claim Big Picture and Red Rock are tribal entities not subject to state law.

293.    As a direct and proximate result of Defendants' unfair acts and practices, Plaintiff Titus and the Washington Class have been injured.  Defendants' conduct has injured the property of Plaintiff Titus and the other Washington Class members by charging and collecting interest that they were not legally entitled to charge or collect.

294.    Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff Titus and Washington Class members, particularly since Defendants continue to

represent that they are lawfully entitled to make loans exceeding Washington's usury cap, continue to make loans to Washington residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to Washington residents.   Thus, Plaintiff Titus and Washington Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

295.   Plaintiff Titus and Washington Class members are entitled to recover actual damages, treble damages, and injunctive and equitable relief.   In addition, Plaintiff Titus and Washington Class members are entitled to recover attorneys' fees and costs pursuant to RCW 19.86.090.

## FOURTEENTH CAUSE OF ACTION
### Violation of New Jersey Usury Laws
### (On behalf of Plaintiff Grandy and the New Jersey Class)

296.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

297.   The maximum interest rate chargeable to consumers under New Jersey law is 16%. N.J. Stat. § 31:1-1(a).

298.   All of the loans made to Plaintiff Grandy and the New Jersey Class members were in excess of the maximum rates allowed under New Jersey law.

299.   Defendants' conduct in doing so was knowing, deliberate, intentional, and willful. Defendants' purpose was to take more than the legal rate of interest for the money loaned to Plaintiff Grandy and members of the New Jersey Class.

300.   Under N.J. Stat. § 31:1-4, Plaintiff Grandy and members of the New Jersey Class are entitled to a declaration that their loans are unlawful and usurious, and restitution of all amounts paid to Defendants in excess of the principal amount, plus the costs of bringing this action.

## FIFTEENTH CAUSE OF ACTION
### Violation of New Jersey Consumer Finance Leasing Act
### (On behalf of Plaintiff Grandy and the New Jersey Class)

301.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

302.    Defendants are or were "consumer lenders" as that term is defined by the Consumer Finance Leasing Act ("CFLA").  N.J. Stat. § 17:11C-2.

303.    Defendants are or were engaged in the "consumer loan business" as that term is defined by the CFLA.  N.J. Stat. § 17:11C-2.

304.     All of the loans made to Plaintiff Grandy and the New Jersey Class were in excess of the maximum rates allowed under New Jersey law.

305.    Defendants' loans to Plaintiff Grandy and members of the New Jersey Class were "consumer loans" as that term is defined by the CFLA.  N.J. Stat. § 17:11C-2.

306.    The CFLA requires that consumer lenders must be licensed in the State of New Jersey.  N.J. Stat. § 17:11C-3.  The CFLA also provides that anyone engaged in business as a consumer lender who is not licensed is "guilty of a crime of the fourth degree." N.J. Stat. § 17:11C-33(b).  The act further provides that loans made by unlicensed lenders "shall be void and the lender shall have no right to collect or receive any principal, interest or charges unless the act was the result of a good faith error…."  *Id.*  In addition, the CFLA provides that "a consumer lender who knowingly and willfully violates any provision of this act shall also forfeit to the borrower three times any amount of the interest, costs or other charges collected in excess of that authorized by law."  *Id.*

307.    At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of New Jersey.  As a result, the conduct at issue herein is not merely unlawful; it is criminal.

308.    Defendants' conduct was not the result of a good faith error but instead was a deliberate, willful, and intentional scheme to circumvent New Jersey law and to collect interest at rates well in excess of that allowed under the law.  Plaintiff Grandy and members of the New Jersey Class are entitled to a declaration that such loans are void.

In addition, Defendants have no right to any principal, interest, or charges on the loans, and Plaintiff Grandy and members of the New Jersey Class are entitled to restitution of all amounts paid to Defendants, plus forfeiture of three times of the amounts of interest, costs, or other charges collected by Defendants in excess of that authorized by law.

**SIXTEENTH CAUSE OF ACTION**
**Violations of New Jersey Consumer Fraud Act**
**(On behalf of Plaintiff Grandy and the New Jersey Class)**

309.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

310.    The New Jersey Consumer Fraud Act ("CFA") prohibits, among other things, the "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission of any material fact … in connection with the sale or advertisement of any merchandise."  N.J. Stat. § 56:8-2.  The requirements of the CFA extend to the offering, sale, or provision of consumer credit.

311.    Defendants' unlawful, criminal consumer lending practices constitute "unconscionable commercial practices" within the meaning of the CFA.

48

312.     Defendants' conduct caused an ascertainable loss to Plaintiff Grandy and members of the New Jersey Class by, among other things, forcing Plaintiff Grandy and members of the New Jersey Class to pay excessive, unlawful, unconscionable, and usurious rates of interest on consumer loans.

### SEVENTEENTH CAUSE OF ACTION
**Violations of Florida Usury Law**
**(On Behalf of Plaintiff Sherman and the Florida Class)**

313.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

314.     All of the loans made by Defendants to Florida consumers used an interest rate greater than eighteen percent (18%).

315.     Fla. Stat. § 516.02(c) provides that "[a] loan for which a greater rate of interest or charge than is allowed by this chapter has been contracted for or received, wherever made, is not enforceable in this state."  Defendants' loan agreements violated Fla. Stat. § 516.02 because they contained interest rates greater than eighteen percent (18%).

316.     Defendants' loan agreements violated the criminal usury provisions of Fla. Stat. § 687.071 because they contained interest rates greater than twenty five percent (25%).  Such loans are "therefore void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

317.     Plaintiff Sherman and Florida Class members are entitled to disgorgement of twice the amount of such usurious interest that was paid.  Fla. Stat. § 687.04.

## EIGHTEENTH CAUSE OF ACTION
### Violations of Maryland Consumer Loan Law
### (On Behalf of Plaintiff Madison and the Maryland Class)

318.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

319.    Maryland's Consumer Loan Law limits the annual interest rate on Defendants' loans as follows:

> (i) For any loan with an original principal balance of $2,000 or less, 2.75 percent interest per month on that part of the unpaid principal balance not more than $1,000 and 2 percent interest per month on that part of the unpaid principal balance that is more than $1,000;
> (ii) For any loan with an original principal balance of more than $2,000, the maximum rate of interest is 2 percent per month on the unpaid principal balance of the loan
> Md. Code, Com. Law § 12-306(a)(6).[6]

320.    Moreover, if an unlicensed lender makes a loan for less than $6,000 and charges interest in excess of Maryland's interest rate limitations, such loans are void and unenforceable, and the lender or any third-party may not collect, obtain, or receive any principal, interest, or charges whatsoever on said loans.  Md. Code, Com. Law § 12-314.

321.    As set forth more fully above, in the course of making and collecting on loans to Plaintiff Madison and other consumers in Maryland, Defendants repeatedly and knowingly charged, demanded, and accepted interest far in excess of Maryland's interest-rate caps.

322.    Accordingly, it was unlawful for Defendants to collect or receive any principal, interest, or charges on the loans, including all amounts paid by Plaintiff Madison and the Maryland Class members.

---

[6] Additionally, "[i]f any principal balance remains unpaid 6 months after the loan matures as originally scheduled or deferred, the lender may not contract for, charge, or receive interest at a rate exceeding 6 percent simple interest per annum on the actual unpaid principal balances from time to time."  Md. Code, Com. Law § 12-306.

323.    Because Defendants' violations were willful, Plaintiff Madison and the Maryland Class are entitled to recover from Defendants any principal, interest, or other charges with respect to the loans.  Md. Code, Com. Law § 12-313(b)(1).  Alternatively, Plaintiff Madison and the Maryland Class may recover three times any excess amount paid.  Md. Code, Com. Law § 12-313(b)(2).

## NINETEENTH CAUSE OF ACTION
### Violations of North Carolina Usury Law
### (On Behalf of Plaintiffs Avent, Gray ("North Carolina Plaintiffs"), and the North Carolina Class)

324.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

325.    The maximum legal interest rate chargeable to consumers under North Carolina law is 8%.  N.C. Gen. Stat. § 24-1.

326.    Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%.  N.C. Gen. Stat. § 24-1.1(c).

327.     All of the loans made to the North Carolina Plaintiffs and the North Carolina Class were well in excess of the maximum rates allowed under North Carolina law.

328.    Defendants' conduct in doing so was knowing, deliberate, intentional, and willful. Defendants' purpose was to take more than the legal rate of interest for the money loaned to the North Carolina Plaintiffs and members of the North Carolina Class.

329.     Because Defendants' violations were willful, the North Carolina Plaintiffs and the North Carolina Class are entitled to forfeiture of the entire amount of interest owed and may recover twice the amount of the interest rate paid.  N.C. Gen. Stat. § 24-2.

## TWENTIETH CAUSE OF ACTION
### Violation of North Carolina Consumer Finance Act
### (On behalf of the North Carolina Plaintiffs and the North Carolina Class)

330.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

331.     North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than permitted by North Carolina's general usury laws without first obtaining a license from the North Carolina Commissioner.  N.C. Gen. Stat. § 53-166(a).

332.     A person who fails to comply with the CFA's requirements "shall be guilty of a Class 1 misdemeanor."  N.C. Gen. Stat. § 53-166(c).  Moreover, "[a]ny contract of loan, the making or collecting of which violates any provision of [the CFA] . . . except as a result of accidental or bona fide error of computation is void, and the licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

333.     All of the loans made to the North Carolina Plaintiffs and the North Carolina Class were $15,000 or less and in excess of the maximum rates allowed under North Carolina law.

334.     At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of North Carolina.  As a result, the conduct at issue herein is both unlawful and criminal.

335.     Defendants' conduct was not the result of an accidental or bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent North Carolina law and to collect interest at rates well in excess of that allowed under the law.  The North Carolina Plaintiffs and members of the North Carolina Class are entitled to a declaration that such loans are void.

336.     Defendants have no right to any principal, interest, or charges on the loans, and the North Carolina Plaintiffs and members of the North Carolina Class are entitled to restitution of all amounts paid to Defendants.

**TWENTY-FIRST CAUSE OF ACTION**
**Violations of Texas Usury Law**
**(On Behalf of Plaintiffs Pough, Martinez ("Texas Plaintiffs"), and the Texas Class)**

337.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

338.     Under Texas law, "[a] greater rate of interest than 10 percent a year is usurious unless otherwise provided by law."  Tex. Fin. Code § 302.001(b).

339.     A person who makes consumer loans and charges interest at a rate higher than 10% is required to hold a license.  Tex. Fin. Code §§ 342.005, 342.051.

340.     All of the loans made to the Texas Plaintiffs and the Texas Class were well in excess of the 10% maximum rate allowed under Texas law.

341.     At no time were Defendants licensed to make consumer loans or to collect or receive payments on consumer loans in the State of Texas.

342.     Defendants' conduct was not the result of an accidental and bona fide error but instead was a deliberate, willful, and intentional scheme to circumvent Texas law and to collect interest at rates well in excess of that allowed under the law.

343.     Accordingly, the Texas Plaintiffs and the Texas Class are entitled to the greater of (1) three times the interest charged in excess of 10% or (2) the lesser of $2,000 or 20% of the principal.  Tex. Fin. Code § 305.001.

344.     Additionally, because Defendants charged the Texas Plaintiffs and the Texas Class interest at a rate twice the amount authorized by Texas law, the Texas Plaintiffs and the Texas Class are also entitled to recover the principal amount of the loan, interest, and any other charges or fees.  Tex. Fin. Code § 305.002.

345.     Alternatively, even if Defendants could take advantage of the higher interest rates permitted under Tex. Fin. Code § 342, *et seq.*, Defendants charged the Texas Plaintiffs and the Texas Class interest in excess of the amount authorized by that law.

346.     Accordingly, the Texas Plaintiffs and the Texas Class are entitled to twice the amount of interest Defendants charged or received, and reasonable attorneys' fees.  Tex. Fin. Code § 349.001(a).  Additionally, because Defendants charged the Texas Plaintiffs and the Texas Class interest at a rate twice the amount authorized by Texas law, the Texas Plaintiffs and the Texas Class are entitled to the principal balance in addition to interest.  Tex. Fin. Code. § 349.002.

### TWENTY-SECOND CAUSE OF ACTION
**Unjust Enrichment**
**(On behalf of All Plaintiffs and All State Classes)**

347.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs.

348.     Plaintiffs and class members conferred a benefit on Defendants when they made payments on loans that were void or made payments of interest beyond the amounts legally collectible under state law.

349.    To the detriment of Plaintiffs and class members, Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from residents of Virginia, California, Illinois, Indiana, Ohio, Washington, Texas, Florida, New Jersey, North Carolina, and Maryland.

350.    As between the parties, it would be unjust for Defendants to retain the benefits attained by their actions.    Accordingly, Plaintiffs seek a full accounting and restitution of Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A.    An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2), and (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B.    An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C.    An Order declaring that Defendants committed the violations of law alleged herein;

D.    An Order providing for any and all injunctive relief the Court deems appropriate;

E.    An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.    An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.      An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.      An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I.       Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

RESPECTFULLY SUBMITTED AND DATED this 23rd day of August, 2018.


Leonard A. Bennett, VSB #37523
Elizabeth W. Hanes, VSB #75574
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
       elizabeth@clalegal.com

E. Michelle Drake
John G. Albanese
**BERGER MONTAGUE PC**
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell
Elizabeth A. Adams, WSBA #49175
**TERRELL MARSHALL LAW GROUP PLLC**
bterrell@terrellmarshall.com
eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA  98103
Tel.:  (206) 816-6603
Fax.:  (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*