**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | | |
|---|---|---|
| RENEE GALLOWAY, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil Action No. 3:18-cv-406-REP |
| | : | |
| BIG PICTURE LOANS, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' STATEMENT OF POSITION REGARDING MATERIAL
MISREPRESENTATIONS MADE TO THE COURT BY DEFENDANTS IN SUPPORT
OF THEIR MOTIONS TO DISMISS FOR LACK OF JURISDICTION**

Plaintiffs, pursuant to the Court's Order (ECF 246 at 7), submit this Statement detailing the material misrepresentations made by Defendants Big Picture Loans, LLC ("BPL"), and Ascension Technologies, Inc. ("Ascension") ("Corporate Defendants") in support of their Motion to Dismiss for Lack of Jurisdiction (ECF Nos. 38 & 40).

Nearly all of the supporting "evidence" offered by Defendants was either: (1) generated after the litigation commenced, such as attorney-drafted declarations and self-serving deposition testimony; or (2) public-facing documents Plaintiffs now understand were created largely for the very use to which they are now being put, which is to build a litigation defense. Now, however, after forcing substantial discovery productions from third parties, the real background and history of the BPL operation is objectively known.

## I. Defendants misrepresented the genesis of the tribal lending arrangement, including the LVD, Tribal Council, and the Co-Manager's roles in Red Rock's lending operations.

BPL spends a significant portion of its "facts" section to purportedly provide "context" for its origin, purpose, and structure, none of which is true: (1) the Lac Vieux Desert Band of Chippewa Indians ("LVD") created Red Rock to "learn the lending industry,"; (2) Red Rock was "managed by appointed LVD members and under the control of the LVD Council," and (3) LVD "had acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services." ECF 40 at 5-9. The declarations submitted by its co-managers follow this same story. Ex. 1 at ¶ 8 ("To learn the lending industry, Red Rock contracted with Bellicose … for vendor management services, compliance management assistance, marketing material development…Red Rock consulted with Bellicose about operations, but ultimately all decisions were made by Red Rock's managers."); *id.* at ¶ 9 ("While Red Rock received advice and consulted with Bellicose about operations, all final decisions about operations were made by Red Rock managers.") (emphasis added).

1

In both this case and in *Williams*,[1] the Corporate Defendants have relied heavily on similar statements by their co-defendant, Matt Martorello. For example, in their replies in support of their motions to dismiss on sovereign immunity grounds in *Williams*, the Corporate Defendants used a Martorello Declaration containing a significant number of misrepresentations, including that "Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation. I have never made a decision on behalf of Red Rock. No company I own or manage has ever made any decision on behalf of Red Rock." Ex. 2 at ¶ 17.[2] This grossly misrepresents the lending arrangement, including the roles of LVD, Tribal Council, and the co-managers. As is now known from Defendants' internal correspondence, Red Rock was specifically designed to be a front, and Martorello's companies handled <u>all</u> of the material aspects of the lending business without any meaningful involvement of the LVD, Tribal Council or the co-managers. After regulators caught onto the scheme, Martorello and Red Rock attempted to enhance what he called the "optics" of the co-managers' involvement, while allowing Martorello to retain operational control.

### A. *Rosette & Martorello initially structured the tribal lending agreement with an express understanding that the co-managers would not be involved.*

Under Red Rock and Bellicose's initial arrangement the Tribal co-managers were meant to be mere figureheads. Recently produced internal communications confirm this. For example, when setting up the venture, Martorello wrote an Aug. 2011 email to Red Rock's attorney, Robert

---

[1] *Williams, et al. v. Big Picture Loans, LLC, et al.*, Case No. 3:17-cv-461(REP).

[2] Similarly, the Corporate Defendants rely on the following misrepresentations that Martorello made at his deposition: Red Rock "was always involved extensively," in the enterprise and Hazen was involved in "every single element that would happen within Red Rock" (ECF 87-1 at 40:21-22, 115-116); "Red Rock and [its] counsel were actively involved and Red Rock and their management team were actively involved in meeting with, you know, vendors and screening vendors and making decisions on, you know, who they liked or didn't like," and that the individuals involved in that process included Chairman Williams and numerous other officials and Tribal Council members." *Id.* at 36:7-37. Red Rock sourced its own leads and become self-sufficient before BPL was formed. *Id.* at 141:1-142:20.

Rosette, and his business partner, Flint Richardson, discussing the structure of the venture. Ex. 3 at 052501. Martorello asked if "the tribal lending entity had a tribal management company, which was going to be the Bellicose customer[?]" *Id*. Richardson responded "no," and in all-caps, clarified that Martorello's "ENTITY WOULD BE THE SERVICER FOR THE LENDING OPERATION. THE LLC MANAGERS ARE MANAGERS OF THE LLC ENTITY ON BEHALF OF THE TRIBE <u>BUT ARENT INVOLVED IN THE BUSINESS</u>." *Id*. at 052498 (caps in the original, underline added). And when asked by Martorello to further elaborate on this point, Richardson explained that "REPRESENTATIVES FROM THE TRIBE ARE THE LLC's **"MANAGERS"**. THE SERVICER, <u>BELLICOSE OPERATES THE BUSINESS COMPLETELY</u>." *Id*. (caps in the original, underline added). The only purpose of this "cornerstone of the sovereign model," Richardson explained, was the ability to characterize "loan originations" as technically those of the tribal lending entity. *Id*. at 052497. This purportedly exempted the loans from state interest rates. *Id*. at 052499.

The enterprise was not only initially designed to allow "Bellicose to operate[] the business completely" but the co-managers had a nominal role going forward. In Martorello's internal email dated January 14, 2016, *i.e.*, four years into the business and two weeks before the closing of the merger, he confidentially wrote: "<u>[a]s far as I know, the Manager's don't really do anything</u>." *Contrast* Ex. 4 at 043978 (emphasis added); *with* Ex. 2 at ¶ 17 ("Red Rock's co-managers were ultimately responsible for all decisions regarding Red Rock's operation. I have never made a decision on behalf of Red Rock."). In his email, Martorello further added that the enterprise's investors "care about the person who runs the business at AT," implying that it could not be a Tribal co-manager or the investors would back out. Ex. 4 at 043978. Martorello continued that he would "defer" to his attorney on what the transaction documents "say if that jives, and what the

3

authority is of [Brian McFadden] vs the Managers, but if Managers <u>are really only involved</u> per the [Operating Agreement] to get feedback from the CEO/President[,] then seems OK." *Id.* (emphasis added).[3]

That Defendants' previous descriptions mischaracterize the co-managers' involvement is obvious. In September 2013, Red Rock's attorneys had to provide a declaration of Chairman Williams in the *Otoe-Missouria* litigation. But Williams did not actually know how Red Rock operated and so his attorneys had to obtain information from Martorello to provide in the declaration. Ex. 6. They asked Justin Martorello for information so that they could "supplement Chairman Williams' declaration with regard to the specific operational impacts that RRTL has faced post-DFS action."[4] *Id.* at 046388. The Martorellos—not Chairman Williams, Hazen, or Mansfield—solely possessed this information. Moreover, Red Rock's general counsel did not even know the operational structure of the lending enterprise, asking the Martorellos to review the "attached diagram" and let them know if it was "consistent with Red Rock's structure?" *Id*. There are numerous other such examples showing this lack of co-manager knowledge and involvement. In another 2013 email, Karrie Wichtman indicated that she had been questioned by a bank's compliance team regarding Red Rock's products. She then wrote:

> While I am fairly familiar with the fact that both [Red Rock] and [Duck Creek] offer installment loan products… there was a question raised from [the bank's] compliance department that the product offered is just a 'dressed up' payday loan product—<u>that requires me and the Co-managers to gain a better understanding of our short term finance products in order to be comfortable handling these questions</u>. While I assured [the bank] that our product is not a pay day product and does not

---

[3] Because the co-managers did not "really do anything" and were "really only involved" on paper, it is not surprising that in February 2016, the Vice Chairwoman of LVD, Joette Pete-Baldwin, had "rallied support that it is a 'rent a tribe' in the community," prompting Martorello to work on a "community outreach message outlining how they [were] not a 'rent a tribe' and highlighting the benefits to the community." Ex. 5 at 00155.

[4] Asserting a joint defense agreement here, Defendants have not revealed the role of Martorello in the drafting of the declarations in this case or of other cooperation to "educate" Williams.

require ACH… <u>that was about all I could say. Is there more that we can offer regarding the product that would be useful for the Co-managers and I to become familiar with to better answer these questions</u>?"

Ex. 7 at 047091 (emphasis added).

Despite all of the direct evidence to the contrary—including emails expressly indicating the co-managers were not involved and Bellicose was to operate the business completely—Defendants repeatedly attempted to mislead the Court regarding Red Rock's operations.

**B.** ***After regulators caught onto the scheme, the enterprise attempted to enhance the "optics," but not the substantive involvement of the co-managers, who were specifically prohibited from learning key information about the business.***

Bellicose not only "completely operated the business," but it intentionally kept Red Rock's co-managers in the dark about basic details of the business, such as vendor contracts and underwriting formulas. This is evident from an email from August 2014—almost three years into the lending business—where Bellicose's general counsel sent a request for approval to the co-managers. Ex. 8. Bellicose sought the approval for a direct mail campaign, and when Wichtman forwarded it to Hazen, she wrote "due to the desire to learn and the pending restructure," she recommended that Hazen "set up a conference call with SPVI so she could learn the specifics regarding the direct mail launch." *Id*. at 045269. In response, Martorello asserted that they would "opt to continue <u>to keep any details of SPVI IP (including DM) explicitly for internal eyes only</u>[.]" *Id*. at 045268 (emphasis added).[5] Such "internal eyes only" correspondence directly contradicts Martorello's Declaration, as does Wichtman's response, which stated that she "wasn't

---

[5] Ex. 2 at ¶ 35 ("LVD received and retained the significant additional economic value of ownership of all intellectual property developed under the agreement by SourcePoint."); *id*. at ¶ 43 ("SourcePoint was required to develop intellectual property for the benefit of LVD and which LVD owned. Obtaining this intellectual property provided significant assets to LVD[.]"); *see also* Ex. 9 (showing Martorello was "paranoid" about transferring SPVI's intellectual property prior to repayment of the note).

recommending that SPVI disclose its secret sauce but only that SPVI be willing to explain to the Co-Managers what exactly they are approving." *Id.* at 045267. She added "do [Chairman Williams] and [Hazen] even know what 'DM' means because I don't" *Id*. If LVD actually received and retained "all intellectual property," it should have been able to access basic information about a direct mailing performed on Red Rock's behalf.

Martorello's response further demonstrates that the genesis of the tribal lending arrangement was a front. In particular, Martorello responded "[r]emember when we started, that all of these vendors and systems" were "tied internally within SPVI systems behind the scenes[.]" Ex. 8 at 045267 (emphasis added). He further added that "[t]he vendor contracts and formulas used were [our] very closely guarded internal IP and entirely unattainable by [Red Rock and Duck Creek]." *Id*. (emphasis added).[6] The only reason this changed, he stated, was "because the risk of working with tribal clients was more and more dangerous and optics became very important." *Id*. (emphasis added). While the "optics became very important," the Aug. 2014 reality was that Martorello continued to withhold basic information from Red Rock, even while trying to cosmetically enhance the appearance of co-manager involvement by creating a check-the-box review of the tasks. *Id*.[7]

---

[6] Even though Martorello "guarded the formulas used," his Declaration nonetheless asserts that "SourcePoint made underwriting recommendations to Red Rock's co-managers who reviewed and independently decided whether to implement." Ex. 2 at ¶ 41. But without access to the formulas used, there would be no way for the co-managers to meaningfully participate in developing the underwriting criteria.

[7] By way of another example, Wichtman emailed Martorello on February 4, 2015, writing that if "the [tribal servicing entity] is going to survive after the sale sunsets or is complete—it cannot operate in a vacuum—it's tribal business and the Tribe needs to know what is happening and be learning about the operation of the [TSE] through building relationships with TSE employees." Ex. 10 at 050595. In response, Martorello stated "I believe the TSE execs will be able to communicate things to the Co-Managers in layman's terms so they can understand how things work and can handle the communications to Tribal Council." *Id*. But if this was already

This evidence directly contradicts that LVD and the co-managers had "acquired years of knowledge and business acumen related to online lending" prompting it to want to purchase Bellicose. *See, e.g.*, ECF 40 at 5-6; Ex. 1 at ¶¶ 8, 9.

### C. *The depositions of Red Rock's co-managers demonstrate the lack of involvement.*

BPL also asserts that "Red Rock consulted with Bellicose about day-to-day operations, but all decisions were either made by Red Rock's managers or expressly delegated and overseen by Red Rock's managers." ECF 40 at 5; Ex. 1 at ¶¶ 8-9. This directly contradicts the initial design crafted by Martorello, Richardson, and Rosette, and the evidence cited above. Additionally, the depositions of Red Rock's co-managers, Michelle Hazen and Craig Mansfield, demonstrate the nominal involvement of Red Rock's co-managers.[8]

Mansfield, along with Hazen, was one of the designated co-managers of Red Rock until he resigned in January 2014. Ex. 11. Despite supposedly working hand-in-hand for more than two years, Hazen could not recall whether Mansfield was even a Red Rock co-manager.[9] Despite not being able to recall *who* the other manager was, Hazen nonetheless signed a declaration somehow claiming that "all final decisions about operations were made by Red Rock's managers." ECF 40-3; Ex. 1 ¶ 9. If Hazen could not recall even the most basic information regarding the identity of the other co-managers, she cannot credibly testify as to the decisions they purportedly made.[10]

---

happening—as repeatedly asserted—this should never have been part of the conversation in February 2015.

[8] *See also* ECF 11 at 20-21; ECF 13 at 7; ECF 38 at 4; *Williams* ECF 34-1 (Hazen Decl.) ¶ 11; ECF 87 at 4 (citing Martorello Dep. (ECF 87-1) at 36:7-37:7, 40:21-22, 115-116, 138:1-142:20, 143); *Williams* ECF 102 (relying on Martorello Decl. (ECF 102-1)).

[9] In particular, Hazen was expressly asked "[d]o you know if Mr. Williams or Craig Mansfield were a co-manager of Red Rock Tribal Lending with you?" Ex. 12, Hazen Dep. at 26:4-6. In response to this question, she testified "I don't recall." *Id.* at 26:7.

[10] Other aspects of Hazen's deposition confirm her superficial involvement. Hazen could not recall the identity of the tribal council member who came up with the idea to create Big Picture Loans (Hazen Dep. at 34:4-14); any details regard the Big Picture Loans portfolio (*id.* at 38:19-21); how

Mansfield's testimony also demonstrates the Corporate Defendants misrepresented Red Rock's operations. For example, when asked if Red Rock made loans under a particular name, Mansfield testified "I don't know the answer to that," and he could not explain its association with Castle Payday. Ex. 13, Mansfield Dep. at 104:5-13. In other words, Mansfield could not identify or explain the most basic piece of information about Red Rock, *i.e.*, the name it did business as and used when interacting with consumers. *See, e.g.*, Ex. 14 (loan agreement: (1) identifying the lender as "Red Rock Tribal Lending, LLC d/b/a CastlePayday.com," and (2) instructing consumers to email "support@castlepayday.com."). He also could not explain why the enterprise created two separate entities, Red Rock and Duck Creek, as opposed to operating a single entity—a seemingly important detail for a manager of a business.[11] Mansfield demonstrated a lack of knowledge for each of the material aspects of the lending business—even for the limited tasks ostensibly designated to Red Rock under the Servicing Agreement. For example, Mansfield did not know the process of "how the decision of whether to fund the loan occurred." Mansfield Dep. at 114:25-115:3. Or whether that process occurred on the reservation. *Id*. at 115:4-14. He did not know how

---

much the loan portfolio was worth when assigned (*id.* at 45:11-14); details regarding a loan Martorello had received with Iron Fence Investments when Red Rock dissolved (*id.* at 45:20-46:18); the terms of Red Rock's contract with Bellicose (*id.* at 51:14-17); whether Red Rock's bank accounts were swept after payment of 2 percent to the Tribe (*id.* at 53:5-11); the reason she received a notice of violation from the TFSRA (*id.* at 71:15-20); the identity of the person who performed a pro form to determine the amount the Tribe could earn through BPL (*id.* at 74:1-7); the amount the Tribe made in 2014 from its lending business with Red Rock or even a ballpark estimate (*id.* at 75:9-76:11); why the amount of money going to the Tribe increased from 2% to 3% in 2017 (*id.* at 80:5-82:2); the amount the Tribe had received from BPL's business before January 1, 2017 (*id.* at 83:10-17); the minimum portfolio BPL maintains (*id.* at 89:16-18); how BPL located Capstone Opportunities as an investor (*id.* at 113:7-11); when Big Picture borrowed money from Capstone (*id.* at 114:6-10); why BPL borrowed $30 million from Capstone (*id.* at 114:12-18); whether the Tribe needed permission from Martorello to take out a $600,000 bridge loan (*id.* at 123:21-124:4); how much interest was charged for the bridge loan (*id.* at 126:21-127:1).
[11] Mansfield Dep. at 91:12-14 ("Q. Why do you need two different entities to make unsecured loans? A. I don't know the answer to that.").

loans were originated, including "whether the ultimate determination to fund the loan was made on tribal grounds." *Id*. at 115:15-22. He further testified that he did not know what verifications were completed to ensure that borrowers provided the correct information, *id*. at 112:15-18, how Red Rock obtained the money it needed to fund the loans, *id*. at 128:24-129:12, or any details about the call center in the Philippines or what it did on behalf of Red Rock. *Id*. at 119:20-120:1.

### D. *The Corporate Defendants materially misrepresented Red Rock's revenue share and desire to enter into business with Martorello, who sought out the relationship.*

The Corporate Defendants and Martorello also misrepresented that LVD approached him; not vice versa. Ex. 2 at ¶ 14 ("In mid-2011, I learned that LVD had identified me as a potential consultant."). They did the same before the Fourth Circuit. Ex. 15, Reply Brief at 10, n. 7 ("The Tribe approached Martorello in 2011 after independently deciding to explore tribal lending, *not* the other way around.").[12] There is no other way to say it than that Martorello lied under oath during his deposition when he claimed that Merritt approached him and said "Hey, I represent a tribe. They're in the online lending business today. They've got a code, they're operating, and they are looking for a good servicer." Ex. 16, Martorello Dep. at 21:22-22:4. After that testimony, Plaintiffs deposed third party Merritt, who would have absolutely no reason to lie about the introduction, and who unequivocally testified: (1) he met Martorello at a conference, (2) Martorello "indicated that he had an interest in working with Native American tribes," and (3) as a result, Merritt introduced him to Robert Rosette, "a very well-known attorney in that space." Ex. 17, Merritt Dep. at 28:12-32:11. Moreover, Merritt testified that he did not introduce Rosette and Martorello "with the LVD in mind," *id*. at 71:2-5, and neither Rosette nor Wichtman indicated to

---

[12] As the Court is aware, Martorello has also repeatedly tried to develop this theme that LVD sought him out, not vice versa. *See, e.g.*, *Williams* ECF 222 at 5 ("LVD's search led them to approach Martorello, based on his prior experience helping another online lender to build its lending operations."); *Williams* ECF 389 at 3-4 (same).

Merritt "that LVD was interested in finding a service provider." *Id*. at 32:12-17. Merritt's

deposition could not be clearer:

> Q. So if Mr. Martorello said that, Scott Merritt approached me indicating that he
> represented the tribe, that would be inaccurate; right?
> A. Inaccurate.
> Q. And it would also be inaccurate if-- that, Scott Merritt told Mr. Martorello that
> the LVD was involved in the -- in an online lending business and was looking for
> a servicer?
> A. Inaccurate as well.
> Q. Okay. And it would also be inaccurate that you told him the LVD had a tribal
> code and was set to make loans?
> A. Inaccurate.
> …
> Q. Well -- okay -- And after [Martorello] was introduced to you, he was the one
> that indicated his willingness or his desire to find a tribal partner; right?
> A. That's correct.
> Q. Yeah. And if Matt testified that you introduced him to members of the LVD's
> tribal council, that would be inaccurate too; right?
> A. Correct.

*Id*. at 92:16-93:24.

Another material misrepresentation and omission presented throughout this case has been

that "LVD developed a comprehensive economic development strategy to build a more diversified

economy." ECF 40 at 3. In reality, the LVD did not develop anything—this is one of several

partnerships designed by Robert Rosette and his firm, who facilitated the transaction for their own

personal benefit; and not just in the form of legal fees. In addition to their substantial legal fees for

their services, Rosette's company, Tribal Loan Management, received a "brokerage fee" of 50%

of Red Rock's revenue share. Ex. 18 at § 7.15. Hazen lied about Red Rock's revenue share under

oath,[13] and it had never been disclosed in any other form (including to the court in *Otoe-Missouria*)

until it was revealed during the deposition of Scott Merritt. Merritt Dep. at 101:22-102:10.

---

[13] When asked "[w]hat percentage contribution would [the government] receive on a monthly basis
from Red Rock Tribal Lending out of the revenue?" Hazen Dep. at 35:19-36:1. Hazen testified "2
percent of the gross." *Id*. at 36:2.

Martorello's Declaration also misrepresented Red Rock's revenue share. Ex. 2 at ¶ 34 (claiming that Red Rock did not receive 2% of net revenue, but gross revenue). He did so because Rosette's profit sharing presented a number of obvious problems for a business claiming to be "wholly owned and operated by LVD." ECF 40 at 5. In July 2012, Martorello raised concerns with Rosette's 50% cut, explaining that "TLM shouldn't be profit sharing like an owner." Ex. 19 at 046397. This component "really [was] an issue to" Martorello, who believed TLM's revenue share put his "capital lent at risk." *Id*. He thought it was "very important we remove TLM as a 'profit sharing 50% of retained earnings broker' because it sounds like '50% owner,'" which "negates the entire tribal owned component that makes [him] as financer/servicer feel like [he was] safe." *Id*.[14]

## II. The Corporate Defendants have materially mispresented the reasons for the restructure and their own creation and purpose.

BPL and Ascension then shift to their next theme: after several years, LVD "had acquired years of knowledge and business acumen related to the online lending industry," thereby prompting it to purchase Bellicose "to begin in-housing services." ECF 40 at 5-6. The Corporate Defendants told this same story in *Williams*,[15] and Hazen's Declaration misrepresents the same. Ex. 1 at ¶ 11 ("After four years of operating Red Rock, LVD had gained considerable experience and knowledge about the sophisticated online lending industry. LVD looked to expand its online

---

[14] Wichtman expressed similar concerns, asserting that "the TLM piece is problematic for a whole host of reasons," and while she did not "have any doubt that for bringing the regulatory structure and the Servicers to the table there should be a fee paid to TLM," that "50% of the Tribe's profits ha[d] always been a bit excessive" in her opinion. Ex. 20 at 044603.

[15] *Williams* ECF 23 at 3 ("LVD's long-term strategy was to grow its lending operation by acquiring its service providers" to "maximize the benefits to LVD."); *Williams* ECF 34-1 ¶ 13 (stating LVD "looked to … acquire our vendors' businesses so the lending would be more profitable"); Brief of Appellants at 8 (informing Fourth Circuit that the tribe "wanted to apply" the knowledge it obtained operating Red Rock to, among other things "acquire its vendors' businesses so that the Tribe would earn more money"); *Williams* ECF 11 at 5 ("LVD had acquired years of knowledge and business acumen related to online lending, and therefore had the expertise to begin in-housing services that were previously provided by outside vendors.").

lending business to earn more money for LVD, to employ more members and area residents, and to acquire our vendors' businesses so the lending would be more profitable."). Similarly, despite all the evidence to the contrary below, the Corporate Defendants submitted a declaration from Martorello, which asserts that "the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies." Ex. 2 ¶ 69 (emphasis added). This is false—there is an abundance of evidence that the sale was motivated by the litigation. Although Martorello and the Corporate Defendants destroyed this evidence as part of the sale, Plaintiffs were able to obtain it from third parties during the merits phase in *Williams*.

### A. *Regulators begin attacking the business model in 2012-13, prompting LVD & Red Rock to file a lawsuit in New York.*

As early as **November 2012**—a little over a year into the business—Martorello had concerns about the viability of the tribal lending model. Ex. 21. In this email, Martorello wrote that he had "some urgent questions" for them "on valuation." *Id*. at 038990. Among other things, he asked how they would value several illegal businesses, such as online poker sites, medical marijuana stores, and drug cartels. *Id*. He further added that "[t]his industry is going to be living in the grey area of its legality for another year or two," and that they had already "received dozens of letters from State AGs saying we need to be licensed and sending Cease and Desist orders." *Id*. In his view, there was "no business with such risk to it" as the tribal lending model, and the "bottom line" was that "this business will simply not exist in 2 to 3 years," at least how it did then. *Id*. at 038991-2. In addition to monetary risks, Martorello explained that Greenberg Traurig provided him with a 20-page legal opinion, concluding that he could be liable "for aiding and abetting felony crime[s]" in states like Georgia. *Id.*

The arrangement between Martorello and Red Rock was supposed to last until December 31, 2018, per the Servicing Agreement. Ex. 18 at § 3.2. But less than two years in, state and federal

regulators caught on to Red Rock's illegal lending practices and threatened to take action. *See, e.g.,* Ex. 22 at 040489, Sept. 2012 Ltr. from Atty. Gen. for Ark.; 040859, July 2013 Ltr. from Atty. Gen. from Conn.; 041125, Aug. 2012 Ltr. from Atty. Gen. for N.C.; 043269, July 2012 Cease & Desist from Atty. Gen. for KY.

The biggest threat came on August 6, 2013, when the New York Department of Financial Services ("NY DFS") issued a cease and desist to 35 online lending companies, including Red Rock.[16] The NY DFS not only issued a cease and desist sent to the "lenders," but the bigger threat posed was the letters it sent to 117 banks and the National Automated Clearinghouse Association, requesting that "they work with DFS to cut off access to New York customer accounts for illegal payday lenders." *Id*. In his public comments on the letters, the Superintendent of Financial Services warned: "Companies that abuse New York consumers should know that they can't simply hide from the law in cyberspace. We [a]re going to use every tool in our tool-belt to eradicate these illegal payday loans that trap families in destructive cycles of debt." *Id*. Six days after the issuance of the cease and desist, Rosette—who represented multiple other tribal lenders—had already drafted a complaint against the NY DFS "for LVD's consideration." Ex. 23 at 041064. In an email to Martorello, Rosette wrote that he "believed strongly if we do nothing we may forever lose the tribal online lending opportunity," which was significant to him considering his receipt of 50% of Red Rock's revenues. *Id*. Rosette further added that it would be "impossible to unwind or undo what the State of New York (in collaboration with federal agencies) have started without a legitimate piece of litigation being filed." *Id*. In a separate email to Martorello, Wichtman echoed

---

[16] *See, e.g.*, The Official Website of New York State, *Press Room, Cuomo Administration Demands 35 Companies Cease and Desist Offering Illegal Online Payday Loans That Harm New York Consumers* (Aug. 6, 2013), *available at* https://www.governor.ny.gov/news/cuomo-administration-demands-35-companies-cease-and-desist-offering-illegal-online-payday-loans.

these concerns, writing "[w]hat do we achieve by laying low waiting for the next bomb to drop—hoping that it doesn't blow us up?" Ex. 24 at 049126. She further added that "[n]othing will be filed unless and until fully vetted with the Tribe and you." *Id*.

On multiple occasions, Martorello expressed concern with joining the litigation as he believed the litigation would be all regulators needed "to do to shut down the business at LVD b/c we simply would not be able to afford to stay in business anymore." *Id*. at 049215 Additionally, he added that the "LVD's house" was not "completely in order yet." *Id.* Because of Martorello's dominance over operations, he cautioned that "LVD" did not "represent the best facts" at the moment because they were not originating the loans on the LVD's reservation. Ex. 25 at 046605. Although the Corporate Defendants have represented that "the contracts for all loans … are formed on the reservation,"[17] the loan contracts actually originated through an "automated process" that did not require handling by BPL employees. Hazen Dep. at 191:5-21, 192:1-5. And although Defendants assert that a final verification of loan agreements was performed on the reservation, Hazen testified that employees located in a call center in the Philippines also would perform that task. *Id.* at 193:4-22. Ms. Hazen did not know what percentage of the approximately 10,000 loans originated each month were verified by employees located on tribal lands. *Id.* at 194:1-18. Given the enterprise contracted with 200 customer service representatives in the Philippines, Ex. 26, and only had ten customer service representatives on tribal land (Ex. 27 at Att. 2), the vast majority of the final verifications inevitably had to occur off the reservation.

Ultimately, Martorello became comfortable enough with the lawsuit and it was filed on August 21, 2013. But, the lawsuit backfired—the district court not only denied Red Rock's motion

---

[17] *See, e.g.*, Ex. 1 at ¶ 30 ("All loans are originated on the Reservation after applications are approved by Big Picture employees located on the Reservation.").

for a preliminary injunction, its findings jeopardized the entire business model. Most notably, in an opinion issued on September 30, 2013, the court found that Red Rock was "subject to the State's non-discriminatory anti-usury laws" because the "undisputed facts demonstrate[d]" that the illegal activity was "taking place in New York, off of the Tribes' lands." *Otoe-Missouria Tribe v. N.Y. Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 361 (S.D.N.Y. 2013). The court further noted that Red Rock "built a wobbly foundation for their contention" that the activity was occurring on "on the Tribes' lands," and contrary to their argument, consumers did not "in any legally meaningful sense, travel[] to Tribal land." *Id*. at 360. Thus, there was "simply no basis" to conclude that the Tribes were "treated differently from any other individuals or entities that enter New York to lend to New York resident." *Id*. at 361.

### B. *Within two weeks of the court's decision, Martorello contacts Rosette regarding a potential sale to provide his companies with sovereign immunity.*

*Otoe-Missouria* created a significant liability for Martorello and Bellicose, who did not have a colorable claim of sovereign immunity. In an email sent two days after the district court's decision, Martorello wrote that the decision "presents a significant liability for [Bellicose] and we do not believe that we should service any new New York loans." Ex. 28 at 006304. He further indicated that they were willing to see existing loans through completion, "but [they] <u>simply cannot flaunt the clear ruling from Judge Sullivan's order</u>, however legally incorrect it might be." *Id*. at 006305 (emphasis added). Martorello further stated a concern that the "finding that tribal enterprises are subject to New York's anti-usury laws will be regarded as sufficiently final… such that it will precipitate their potential investigation and prosecution of us personally and our companies if we continue" to conduct business in New York. *Id*. at 006304.

Two weeks after the district court's decision, Martorello sent an email to Rosette regarding a restructure to protect Martorello/Bellicose. In this email, which had a subject line entitled "<u>LVD</u>

to take ownership of Bellicose VI," Martorello presented some options for a restructure so that Bellicose could attempt to share in LVD's immunity. Ex. 29 (emphasis added).[18] One of those options was for Bellicose to "[a]ssign today LVD 51% of Bellicose via Equity only membership interest tied to the SPVI subsidiary only." *Id*. (emphasis added). Additionally, he proposed assigning 51% of the interests in his other businesses involved in the scheme. *Id*. Each of these transactions, per Martorello, would be "structured to provide all entities sovereign immunity." *Id*. (emphasis added). And trying to maximize his profits before the business was shut down, Martorello further proposed that BlueTech, his trust, would "own 49% equity, but 100% profits interests until 49 months," *i.e.*, ensuring Martorello would retain the profits until the business was gone. *Id*.[19]

A few weeks later, Martorello reiterated his concerns to Wichtman. In an email dated October 29, 2013, he informed Wichtman that vendors and debt providers of Red Rock were "asking what would happen to everything if the ruling in NY were upheld[?]" Ex. 31. The repercussions, according to Martorello, would be "certain death" and "all vendors including [SourcePoint], banks, ACH processors, bureaus etc would all obviously shut down if it were

---

[18] Before the Fourth Circuit, the Corporate Defendants argued that "there was no evidence" that the restructure was intended to provide Martorello/his companies with immunity. Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 13:53-14:30, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3 (Hurd: "Essentially, the idea below seems to be that by doing business with Martorello" and "acquiring SourcePoint, that we are protecting him from something or other or we are cloaking him with sovereign immunity, how can that be?" The Court: "Well, what is the evidence of that in any event?" Hurd: "There is no evidence. In fact, the evidence is quite to the contrary. . . . He has no sovereign immunity. And the idea that somehow that that is the purpose" that this was some "extravagant of altruism to protect this non-tribal guy, it just makes no sense.").

[19] On a different occasion, Martorello urged Wichtman to consider a previous idea of the LVD adopting him, writing "something that really struck me [in *Otoe-Missouria*] was they mentioned the citizenship of the participants a lot. At council we talked about adoption. It seems like an excellent next step, not to mention an honor to me personally as well." Ex. 30 at 053384.

considered off reservation activity[.]" *Id*. (emphasis added). He further added that "class actions" and "personal threats of enforcement actions against individuals by regulators" has "everyone spooked," causing "several of the biggest servicers" to "shut down." *Id*. In closing, Martorello proclaimed "[d]esperately hoping that Rule 19 works and a favorable outcome on the appeal!" *Id*.[20]

On December 30, 2013, Rosette circulated a legal memorandum regarding Martorello's proposed transaction, analyzing whether "whether formation of a new entity that is co-owned by the Tribe and Source Point and subject to the proposed profit, management and voting controls" suggested by Martorello would be "sufficient to pass muster with the 'am of the tribe' test to extend the Tribe's sovereign immunity from suit to the new LLC." Ex. 33 at 052248. In response, Martorello indicated that one of the proposed features—a 10% revenue allocation to the tribal entity—was not "going to work from a business standpoint" and he "might as well be a state licensed lender[.]" *Id*. at 052247. If litigation occurred, he further added "[w]hat I think you'd tell a court" is "that if the deal were not done," then the Tribe would not know: (1) "if SPVI would be around in 10 days given the industry," (2) execute "its termination provision in accordance with the" servicing agreement, or (3) "hike rates as risk has gone through the roof with detractors now seeking out SPVI's of the world for major attacks." *Id*. Martorello also stressed the urgency of the deal, writing "[c]lock is ticking before I end up in a Cash Call type attack though, at which point,

---

[20] On November 8, 2013, Martorello sent similar email to Wichtman, explaining that Red Rock was "down now about 55% from where it was in July" and that SourcePoint was "about to be discovered and will need extreme resources to defend itself against all kinds of aiding and abetting and 'true lender' claims" coming in the first quarter of 2014. Ex. 32 at 052787 (emphasis added). He further noted that there was a "very significant possibility that should we even survive long enough to get there," he would need "to defend [him]self even personally (in more than civil matters), with no ongoing business or revenue at all should the decision be made in the appeal that the activity is in fact OFF reservation (a certain end to the industry)." *Id*. (emphasis added)/

I think the deal is about dead." *Id*. at 052248; *see also* Ex. 34 at 00018128 (characterizing the CFPB's position in its litigation against CashCall as "without question a major attack on legit tribal lending operations."); *id*. (stating that if a similar "attack" on the Red Rock operation happened, he warned, "the stakes are very literally everything.").

In January 2014, with the appeal pending, things continued to get worse for the industry, as well as for Martorello's enterprise. On January 8, 2014, the DOJ announced a consent decree with a major ACH provider, which Robert Rosette described as "the most disastrous result we have seen yet," and he predicted that he "would not be surprise[d] if we lost the last remaining banks and ach processors servicing tribal accounts after reading the consent decree." Ex. 35 at 052155. Sure enough, the enterprise lost its only ACH processer the following day, which "obviously ha[d] major implications for [M]att since he ha[d] no other processors." Ex. 36. And when the enterprise attempted to obtain a different processor, one bank explained that they were told "if the bank so much as processes a single transaction [t]he DOJ will be relentless in shutting them down under the full weight of the US government." Ex. 37 at 036580. By this time, Red Rock had also received more than a dozen warnings from state attorney generals' offices. Ex. 22.[21]

**C.  *With appeal pending, Martorello makes overture to the Chairman in Aug. 2014.***

Martorello was also paying close attention to the litigation involving others industry, including cases filed against CashCall, Scott Tucker, and others.[22] By August 2014, even with the appeal still pending, he had seen enough. Although the term of the Servicing Agreement was effective until December 31, 2018, Martorello knew the business model was at risk and the

---

[21] *See also* Ex. 20.
[22] Ex. 38 at 048497 (email from Martorello to Rosette in response to *CashCall* opinion, asserting "Let's zero in asap on minimizing my risk for being individually liable like CO just successfully did to Butch [W]ebb. . . . I don't want my company on anything that goes to the CFPB."); Ex. 39 (email to Wichtman about Tucker/AMG Services settlement with the Federal Trade Commission).

consequences would be severe. Ex. 34 at 00018129 (explaining the CFPB would go after "all revenue ever collected from consumers" and that "number" was "unobtainable by every investor combined."). On August 11, 2014, Martorello sent an email to Chairman Williams—not vice versa—"we're working on something" that "will have some talking points to go over about the concept for a potential bigger deal for LVD learning the Servicing business." Ex. 40 at 00020786 (emphasis added). Martorello suggested to start "with a phone call, and then if we're close you can come to Puerto Rico to finalize" the terms. *Id*.

On August 26, 2014, Martorello sent another email to Chairman Williams providing more details and stressing the urgency of the restructure. Ex. 41. He wrote that Bellicose wanted to "move quickly to transition the business into very capable hands." *Id*. at 048541. Martorello further explained that he had "to stress the urgency on [his] end" and "SPVI/BVI are looking to move very quickly on such an exit." *Id*. at 048541-2. Far from being the LVD's idea to restructure, he further noted that "rather than putting the business on the 'auction block' to the highest bidder," they were coming "exclusively to LVD," but it was "important that LVD knows that time is of the essence for SPVI/BVI in getting a sale done." *Id*. Martorello indicated that he wanted to know "if LVD is interested or not interested," so they could "move as quickly as SPVI/BVI needs to so that we're not inadvertently disadvantaged." *Id*.; *see also* Ex. 42 ("If we can't reach terms with LVD to buy SPVI, then SPVI will be sold to another Tribe (likely Middletown).").

Williams did not respond to Martorello's email that day, prompting Martorello to email Wichtman later that evening. He had not heard "anything back from the Chairman," nor did he get "any sense of excitement from anyone[.]" Ex. 9 at 045272.[23] Instead, as far as Martorello knew,

---

[23] The October 14, 2013 email to Rosette is the first document mentioning any potential sale to the LVD. *See* Ex. 29. Yet, to facilitate their fabrication regarding the sale, Martorello's Declaration falsely asserts that "since at least 2012, LVD and I have engaged in multiple conversations relating

Tribal Council "only approved evolving the term sheet into something that would be reviewed later to ask questions about, and if approved, then it'd be binding." *Id*. He further stressed that there would be "a lot of legal details to go through" on the deal and "the seller will have to keep a final say so in business decisions to protect the business from being destroyed by the new owner before paid." *Id*. (emphasis added). Martorello made clear he did not want anything beyond cosmetic changes, explaining there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." *Id*.

On October 1, 2014, the need for cosmetic changes became urgent when the Second Circuit affirmed the district court's decision in *Otoe-Missouria*. The Second Circuit made several damaging findings, including that "New York's usury laws apply to all lenders, not just tribal lenders[.]" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 117 (2d Cir. 2014). The court also observed that "Native Americans 'going beyond the reservation boundaries' must comply with state laws as long as those laws are 'non-discriminatory [and] … otherwise applicable to all citizens of that [State].'" *Id*. at 113 (quotations omitted).

After the Second Circuit issued its decision, Martorello wrote to Wichtman on October 10, 2014, urging her (as general counsel for LVD and Red Rock) to drop the case. Ex. 43 at 043659 ("I can't urge any stronger that LVD not proceed"). He indicated that "SPVI won't be willing to testify, or do anything as the result of another filing will certainly end in a slew of attacks on me, SPVI and my team." *Id*. Ultimately, Wichtman agreed and, as she explained in a subsequent email,

---

to the potential sale of my consulting businesses to LVD to accelerate LVD's ability to maintain a profitable online consumer lending business with no outsourced consulting services." Ex. 2 ¶ 49. There is not a <u>single</u> piece of paper or email supporting Martorello's testimony that they contemplated a sale in 2012—something that would certainly exist for an arrangement where the participants worked thousands of miles away from each other. And tellingly, after Martorello made the first overture regarding the sale, he did not get "any sense of excitement from anyone." Ex. 9.

their best option was to "go quietly into the night and restructure based on what we know from the opinion in order to build an even stronger case for future litigation." Ex. 44 at 001130 (emphasis added); *see also* Ex. 45 at 044075 (Martorello proclaiming that he wanted "BPL to be born from the learnings of all 2nd Circuit commentary possible…").

The parties started moving quickly to restructure the business—even though they had not reached an agreement in principle to the major terms, including the price to be paid. Among other things, Wichtman obtained a tax EIN for BPL on December 1, 2014. Ex. 46. On February 5, 2015, the Tribal Council adopted a resolution creating Ascension and designating Brian McFadden as its president. Ex. 47. Immediately following Ascension's creation, SourcePoint began assigning its contracts to Ascension—another sign that the restructure was not an arm's length transaction, but a façade designed to protect Martorello and his team. *See, e.g.*, Ex. 48. Similarly, Ascension designated McFadden and Simon Liang as the signatories on its bank account on February 19, 2015. All of these steps—creation of Ascension, designation of McFadden as its president, assignment of contracts, adding signatories to bank accounts—were taken months before the parties entered into the Agreement and Plan of Merger dated September 14, 2015. Ex. 49.

Despite all of this evidence, Martorello falsely stated in his Declaration that "the decision to sell Bellicose to LVD was not motivated by impending threats of litigation or enforcement actions by government agencies." Ex. 2 ¶ 69. He went as far as to characterize the connection between litigation and the sale as "nonsensical" and "temporally problematic" because the sale "occurred eighteen months to three years" after the litigation. *Id*. The Corporate Defendants argued the same, including to the Fourth Circuit. *See* supra, fn. 18; *see also* Ex. 15 at 10, n. 7 (dismissing that this Court "somehow found material" the *Otoe-Missouria* litigation).

**D.**  ***The Corporate Defendants misrepresented the genesis of the creation of Big Picture, which had been developed by Martorello for another tribe.***

Defendants further misrepresent the circumstances surrounding the formation of BPL, which they contend "was created to be an online lending business in order to bring revenue to LVD[.]" Hazen Dep. at 14; *see also* ECF 38 at 5 ("LVD began by creating Big Picture in August 2014."). This part of the story is designed to create the appearance that the LVD was the driving force and came up with the idea for the creation of BPL. And consistent with this, when asked "whose idea" was it "to create Big Picture Loans," Hazen testified that it was the "tribe's." Hazen Dep. at 34:4-8. But other than testifying it was the Tribe's idea to create BPL, Hazen could not recall which tribal member's idea it was or when the idea first came into existence. *Id*. at 34:12-21. And when asked "who picked the name," she testified "[i]t was a group discussion." *Id*. at 38:7-9.

In reality, documents produced from Martorello's third party marketing firm show that he created BPL at least a year before Defendants claimed LVD did so. One of these documents is a "Communications Plan," for Bellicose dated September 30, 2013, *i.e.*, the same day the district court issued its opinion in *Otoe-Missouria*. Ex. 50 at 002899. Bellicose had anticipated launching BPL with a totally unrelated tribe located at the Fort Belknap Indian Reservation, *id.* at 02904, but the launch of the lending enterprise was on hold pending ACH configuration. *Id.* at 02908. And shortly after the district court's decision in *Otoe-Missouria*, Justin Martorello emailed the marketing company, instructing that tasks associated with "Big Picture" should be a "FULL STOP," and "given the massive attacks on the industry we do not plan [to] use these sites." Ex. 51 at 0003894. Two weeks later, Bellicose terminated its contract with the marketing firm, citing "the various challenges and legal uncertainty in the lending industry," had caused Bellicose to reassess and reprioritize "its current projects and relationships with third party vendors." Ex. 52.

Evidence produced by Rosette further proves that the Tribe did not come up with the idea

to create BPL. Instead, in July 2014, Martorello emailed that "CastlePayDay needs a rebrand." Ex. 53 at 058409. Martorello further explained that "RRTL ha[d] been blacklisted and rolled through the mud in the press" following the *Otoe-Missouria* decision. *Id*. He further added that "it's time to get away from the word 'payday' and the black mark of RRTL before rules come out and things get hotter." *Id*. Thus, he suggested "forming ASAP a new LLC with a new domain/brand, for purposes of transferring all contracts, assets, bank accounts, liabilities etc. over to the new entities when ready." *Id*. Bellicose would "facilitate the work," but it needed "the entity formed and approv[ed] to begin doing so as to step 1." *Id*. In response, Wichtman emailed Hazen asking "as CEO for RRTL," whether she felt "comfortable representing RRTL to council" on the rebranding. *Id*. at 058408. Wichtman further added "we need to make sure we have someone who can 'own the process' to get it over the finish line." *Id*. In response, Hazen wrote: "I certainly do agree and yes I would be happy to present this to the Council." *Id*. Three days later, Martorello had "the work and imaging done for ChorusLoans." *Id*. at 058407.

On August 25, 2014, Martorello emailed Wichtman that "Chorus has been sold." Ex. 54 at 043435. But Martorello had "another really great brand" known as Big Picture Loans. *Id*. In this email, he attached a document entitled "Big Picture Site Design" showing a fully developed website and brand for BPL. *Id*. at 043437-57. "Assuming LVD" bought SPVI, Martorello claimed that "BigPictureLoans.com would be an excellent domain," but he also had available "FirstNationLoans.com." *Id*. at 043437. Wichtman responded "[w]hich one do you want me to use?" *Id*. at 043435. It was left up to Martorello to decide on "BigPictureLoans.com." <u>The following day</u>, Wichtman submitted his resolution for the creation of BPL, as well as approving its Articles of Organization and Operating Agreement. Ex 55 ("the Council has been presented with Articles of Organization and an Operating Agreement for the tribally chartered business entity

to be known as Big Picture Loans, LLC…..").

**E.** ***The restructure was designed to maintain Martorello's control while, at the same time, insulating his childhood friend & business partner.***

Contrary to their theme that the restructure would enhance LVD's ability to learn the business, discovered evidence shows that it was designed to ensure—and required—the Martorello team's continued control of operations. As Martorello explained to Wichtman, there was "[n]o need to reinvent the wheel or shake things up, just need to keep it alive and then use the earnings from it to take risks with and do other things." Ex. 9 at 045272. When Hazen appears to have been originally uncomfortable with the idea, Wichtman convinced her "to leave the org chart unchanged" and understood the "importance of keeping status quo to ensure success!" Ex. 5 at 00135. And all of this came at the orders of Martorello, who insisted that "<u>the Bellicose Companies will be sold only 'as is', with existing Management in place and the company remaining substantially the same</u>." Ex. 56 at 040179; *id*. (explaining the tribal servicing entity "needs to be run in the same format it is today.").

They maintained the status quo even though one of Rosette's lawyer identified the structure opened them up to rent-a-tribe arguments similar to "the current class action litigation pending in Vermont," *Gingras v. Rosette*. Ex. 57 at 043997. To avoid this, she wondered whether they needed to "to put these things in writing." *Id*. Martorello insisted the term be in writing, saying it was "take it or leave it[.]" *Id*. at 043996. He further added that "Servicer comfort" was the "only way" that an important investor would "be involved." *Id*. From "their perspective," if LVD "was to cut SPVI out of the picture, then [it] simply cannot perform as a business." *Id*. And, as Martorello explained in a different email before closing, BPL's "[l]enders care about the person who runs the business at AT." Ex. 4 at 043978. So long as the restructure documents were "clear that the position in question and under scrutiny to the lenders is President and CEO (Brian)," then it was ok. *Id*. And

this is exactly what they did—BPL contractually relinquished the right to control operations to its "servicer," Ascension, who contractually relinquished the right to control its operations to McFadden. *See* Exs. 58, 59. It all remained exactly the same except for one change: it was now ostensibly "structured to provide all entities sovereign immunity" as per Martorello. Ex. 29.

The structure was also designed to "insulate" McFadden. Ex. 10. As Wichtman explained, she and Matt "contemplated" in 2015 that "the co-managers would be named as Shelly and the Chairman in order to further insulate Brian as a tribal employee." *Id*. at 050593. This "co-manager insulate model," as labeled by Wichtman, would provide an extra layer of protection for McFadden "as President." *Id*. at 050595. McFadden "would then have his duties defined by his position description, his contract and certain delegations of authority by the Co-Managers" to ensure control over the operations as needed by Martorello. *Id*. at 050593.[24]

**F.   *To bolster the appearance of a legitimate transaction, Defendants have materially misrepresented the value of Bellicose at the time of the sale, including to the Fourth Circuit Court of Appeals.***

BPL asserts that "Bellicose was valued at just over $100 million" at the time of the sale. ECF 40 at 7. Unsurprisingly, it did not cite any evidence to support this assertion, which is directly contradicted by a significant number of documents showing that Bellicose had little, *if any*, value at the time of the merger and closing. At the oral argument before the Fourth Circuit in *Williams*, the Corporate Defendants' counsel asserted "there has been no suggestion and certainly no

---

[24] Consistent with this plan, members of the Tribal Council have confirmed that things have stayed the same after the restructure. For example, when asked about the differences after the restructure, Chairman Williams testified "As far as I'm concerned, everything that was being done was just transferred over to Ascensions to keep the flow going." Ex. 60, Williams Dep. at 19:22-20:22. Another member, Secretary McGeshick, echoed this belief. Ex. 61, S. McGeshick Depo., 16:12-15 ("Q. Okay. So, do you know what services Bellicose provided to Red Rock? A. They would have to do -- they were -- they did like the -- the same thing as Ascension does today.")).

evidence and no finding that the Tribe somehow paid too much for" Bellicose.[25] They made a similar representation in their Fourth Circuit reply brief. *See* Ex. 15 at 12 ("There is no evidence the purchase price exceeded the value of the assets acquired."). While unavailable in *Williams*, there is now an abundance of evidence showing that the Corporate Defendants have misrepresented the value of the business, which was worthless as it was about to be shutdown.

For example, in an email dated October 2, 2015, Martorello provides his thoughts on "FMV vs. FV" of Bellicose, i.e., its fair market value v. future value. Ex. 62. Explaining his certainty in the business' low fair market value, Martorello provided 11 points, including "1) the Tribe is buying it b/c our contract gets terminated and they want this to continue[,] 2) Operation Chokepoint is a risk for SPVI owners but not for the Tribe[,] 3) All lawsuits against Servicers is removed from the equation for the Tribe to lose us… 7) They risk that they lose their debt investors if we go away, this deal keeps debts investors comfortable to remain, whereas they'd leave if a new vendor replaced us… 10) IN THE UNLIKELY EVENT that the CFPB rule doesn't take them down, then they pay as they go via a Seller financed deal rather than taking risk. . . ." *Id*. at 09845-6. Martorello further added "there is the risk that we get shut off from banking immediately (or the Tribe does) and we suffer catastrophic damages even worse than CFPB rule." *Id*. at 09846.

Martorello sent a similar email to a business valuation firm on December 5, 2015, *i.e.*, about six weeks before the closing, explaining that "efforts would be attempted by [s]tate governments to shut down tribal lenders (and are being attempted in fact)." Ex. 63 at 005530. One of those was an action filed by the Pennsylvania Attorney General, which Martorello characterized as "the most significant issue/risk to SPVI" as "PA could bring the same claims against SPVI for

---

[25] Fourth Circuit Court of Appeals, Oral Argument/Listen to Oral Arguments, Opening Argument of William Hurd, Audio File at 4:47-4:55, http://www.ca4.uscourts.gov/OAarchive/mp3/18-1827-20190507.mp3.

sure." *Id*. at 005530-1. Martorello further added that Red Rock had already "received threats from several state AGs demanding they stop lending or they will come after them." *Id*. at 005531. In addition to attorney general threats, he further opined that the NY DFS has "issues too" with tribal lending "and they could go after SPVI as well." *Id*. Martorello encouraged the firm to include all "of the support that says CFPB rule <u>will shut this business down</u>, and how operation choke point is hurting everyone." *Id*. (emphasis added). He similarly wrote that "It was estimated that t<u>h</u>e industry would be wiped out in Feb. 2014 by the new CFPB, and/operation chokepoint tactics." Ex. 64 at 01446. Martorello offered that "[a]ccurately enough, the clients lost ability to debit borrower bank accounts in January 2014" and they "made no loans for many months after out of fear banking would be fully cut off for good." *Id*. Consistent with this, he sent a similar e-mail to the President of the Online Lender's Association ("OLA"), asking for a simple report "that justifies a position I have taken on the industry in a valuation study." Ex. 65. That position, as Martorello explained, was that "Servicing of Tribal Lending will be shut down from new originations and forced into orderly liquidation mode (at best)… as a result of two factors: 1) CFPB (new rule or otherwise)" and "(2) Operation choke point (in this case that terms includes AG lawsuits like VT/PA v. Think [Finance].")." He asked for "all the bullet point support I can get, ideally with references to articles perhaps." *Id*. There are multiple emails reiterating this position that the tribal lending would be shut down.[26]

> ### G.  *The Corporate Defendants have materially misrepresented that cost savings was the impetus behind the acquisition of Bellicose.*

The Corporate Defendants claim that they "acquired years of knowledge and business

---

[26] *See also* Ex. 66 at 05387 ("Lawsuits by AGs and regulators against SPVI, myself, or the client (as the reports and cases filed to date against competitors supports) may end the business or seriously shrink the business"); Ex. 67 at 011671 ("we thought (and data supported) 'end of days in 2015'" because of Operation Chokepoint).

acumen related to online lending," and "had the expertise to begin in-housing services that were previously provided by outside vendors" like Bellicose. ECF 40 at 6; ECF 38 at 5; *see also* Ex. 1 ¶ 11 ("LVD looked to expand its online lending business to earn more money for LVD[.]"). To that end, the Corporate Defendants claim that the acquisition of Bellicose enabled them to bring "'in-house' many of the activities… resulting in significant cost savings and efficiencies." ECF 40 at 7; *see also* ECF 38 at 15 (arguing that Ascension enhances self-sufficiency because it is "a below-cost service provider," which "in turn generates more profit for LVD."); Hazen Dep. at 63:3-6.

That cost savings, according to the Corporate Defendants, resulted in a decrease of "approximately $1.4 million per month on outsourced services," to spending "on average "$224,262.71 per month through its relationship with Ascension." ECF 38 at 22. In other words, the Corporate Defendants claim that "$1.2 million saved per month is more profit to LVD." *Id.* It is not—rather than paying for "outsourced services," BPL is paying the same amount to Eventide as a creditor. It is not saving "$1.2 million" per month in profits; they just changed the form of the transaction.

Even putting these misleading statements aside, it is false to assert that Ascension is "a below-cost service provider." ECF 38 at 15. In reality, the Intratribal Servicing Agreement requires BPL to pay "**110%** of the hourly salary costs" for Ascension's employees. Ex. 58 at § 3.4 (emphasis added). Additionally, because Bellicose's employees were scared about continuing to work for the illegal enterprise,[27] the restructure contemplated "a bonus plan" of "no more than

---

[27] Ex. 68 at 040216 (Martorello email: "keeping these employees" who "are frightened already" was "vital to not have a mutiny on [their] hands."); Ex. 56 at 040179 (explaining the tribal lender and the tribal servicer needed to remain separate because "the PR effect of hiring on (existing or new) very talented/vested career professionals who will understand they risk being labeled by

150% of employee wages[.]" *Id.* Consistent with this, McFadden went from making $171,285.00 at Bellicose to $265,000.00 at Ascension. *Compare* Ex. 69, *with* Ex. 70. Similarly, James Dowd and Simon Liang's salaries increased by $60,000.00. *Compare* Ex. 69, *with* Ex. 70. Far from "saving" by bringing these services "in-house," BPL is now paying more for the same services provided by Bellicose.[28]

### H. *The Corporate Defendants materially misrepresented Martorello's authority and ability to control operations after the sale.*

BPL claims that "[a]fter the acquisition was complete, Martorello's relationship" changed from "a consultant employed by Bellicose" to "a creditor as owner of Eventide." ECF 40 at 8; ECF 40-3 ¶ 22; ECF 38-5 ¶ 22. To that end, BPL asserts that Martorello "has no authority over Big Picture" and that he "had no involvement in any aspect of Big Picture's operations" since the acquisition. *Id.*; *see also* ECF 87 at 3; ECF 88 at 3. This is false and misleading. Understanding Martorello's continued authority over the business requires an understanding of the various, inter-related agreements crafted as part of the restructure. First, through the Intratribal Servicing Agreement, BPL relinquished to Ascension the right to control the vast majority of the responsibilities for its operations. Ex. 58. Ascension then contractually relinquished the right to

---

peers as working for some 'illegal' lender is a major handicap on the organization, as opposed to working for a cutting edge tech/analytics shop that is more protected from the biased media.").

[28] Martorello has also materially misrepresented the impetus behind the sale of Bellicose, asserting that it "was motivated by a tax savings opportunity," not a desire to shield himself while continuing the illegal enterprise. *Williams* ECF Nos. 368 at 2; 389 at 2; 455-1 at 7; 487 at 23. But in August 2014—right after Martorello first emailed Chairman Williams about the concept for the sale— Martorello wrote that he would "likely have a massive negative tax consequence" associated with the sale, but he was nonetheless "ready to proceed with a potential sale/discussion." Ex. 71 at 052619. Moreover, Martorello was still determining the tax implications on January 30, 2017*, i.e.*, a year after the sale. Ex. 5 at 00160-1 ("you won't pay any taxes for the next 3 years no matter where you live," and he would "know for sure in like 2 months," to which his brother responded "that's a 180 from a few months ago.").

control its operations to McFadden, Martorello's childhood friend and business partner.[29] Under the Delegation of Authority Policy, Ascension delegated McFadden with the authority to handle Ascension's "strategic direction, goals and targets," and over "all matters necessary for the day to day management of Ascension." Ex. 59 at § 1.4(a)-(e)). And while Hazen and Williams' authority to appoint the president seems to provide some control, the Loan Agreement neutralizes this power because it requires Hazen and Williams to obtain approval from Martorello (albeit via Eventide) to replace McFadden. Ex. 74.

Martorello created a check on McFadden's power through Eventide's operating agreement, which allows him to revoke McFadden's shares within 14-days' notice. Ex. 72 at § II(I). Martorello considered wielding this power in August 2016 as evidenced by a text message exchange with his brother, another former officer of Bellicose and now owner of Eventide. Ex. 5. In this text exchange, Martorello expressed concern that "Brian [McFadden] and James [Dowd] are getting too big for their britches." *Id.* at 00157. He further explained that "they see monthly wires and are starting to think they deserve a lot more of it now than the $1mm a year Brian makes for being a hired CEO." *Id.* Martorello wrote that McFadden "may have to be disappointed somewhere down the near term road," as "he's not the founder and $1mm a year buys a lot of very capable replacements." *Id*. Put differently, even after the sale, Martorello remained in control through this ability to remove McFadden, albeit by revoking his shares and equity in Eventide.

<div style="margin-left:40%">

Respectfully submitted,

</div>

Date: June 28, 2019

<div style="margin-left:40%">

_____/s/_____

Leonard A. Bennett, VSB #37523
Elizabeth W. Hanes, VSB #75574

</div>

---

[29] Martorello Dep. at 94:20-22 ("A. I've known Brian McFadden from riding bikes in the fourth grade."); Ex. 69 (showing McFadden owned shares in Bellicose); Ex. 72 (showing McFadden's ownership in Eventide); Ex. 73 (showing Martorello and McFadden co-own SunUp Financial, *i.e.*, a state licensed lender operating out of Utah).

CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
elizabeth@clalegal.com

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

E. Michelle Drake
John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell
Jennifer Rust Murray
Elizabeth A. Adams
TERRELL MARSHALL LAW GROUP PLLC
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
eadams@terrellmarshall.com
936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax.: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Date: June 28, 2019

<div style="text-align:right">

/s/
_____

Leonard A. Bennett, VSB #37523
Elizabeth W. Hanes, VSB #75574
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Blvd., Ste. 1-A
Newport News, VA 23601
Telephone: (757) 930-3660
Facsimile: (757) 930-3662
Email: lenbennett@clalegal.com
elizabeth@clalegal.com

Kristi C. Kelly, Esq., VSB #72791
Andrew J. Guzzo, Esq., VSB #82170
Casey S. Nash, Esq., VSB #84261
KELLY GUZZO, PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7572
(703) 591-0167 Facsimile
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com

E. Michelle Drake
John G. Albanese
BERGER MONTAGUE PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Tel.: 612.594.5999
Fax: 612.584.4470
emdrake@bm.net
jalbanese@bm.net

Beth E. Terrell
Jennifer Rust Murray
Elizabeth A. Adams
TERRELL MARSHALL LAW GROUP PLLC
bterrell@terrellmarshall.com
jmurray@terrellmarshall.com
eadams@terrellmarshall.com

</div>

936 North 34th Street, Suite 300
Seattle, WA 98103
Tel.: (206) 816-6603
Fax.: (206) 319-5450

*Attorneys for Plaintiffs and Proposed Classes*