# EXHIBIT ZZ

WILLIAMS v. BIG PICTURE LOANS

GERBER, RICK

12/17/2018

Northwestern Court Reporters

(800) 628-7551

Page 69

1 businesses that we felt comfortable with.
2 Q And you concluded that they were?
3 A In '12 and '13, I think, yes, we did.
4 Q And you continued to do business with them moving
5   forward?
6 A Uh-huh, yeah.
7 Q That's a yes?
8 A Yes.
9 Q On page 1 of this report, there's a sub -- there are
10   a bunch of sub-bullets, but it's under the heading
11   Key Findings.
12     I believe, Mr. Gerber, it's the fourth page of
13   the document itself.
14 A Okay. Oh, yeah.
15 Q Under the second sub-bullet, the second sub-bullet
16   reads, Operation Choke Point has forced banks to
17   terminate relationships with a wide variety of
18   entirely lawful and legitimate merchants. The
19   initiative is predicated on the claim that providing
20   normal banking services to certain merchants creates
21   a, quote, reputational risk, end quote, sufficient
22   to trigger a federal investigation. Acting in
23   coordination with Operation Choke Point, bank
24   regulators labeled a wide range of lawful merchants
25   as, quote, high-risk, end quote, including coin

Page 70

1   dealers, firearms, ammunition sales, and short-term
2   lending. Operation Choke Point effectively transformed
3   this guidance into an implicit threat of a federal
4   investigation.
5     Did I read that correctly?
6 A Yes.
7 Q Leaving aside that I understand you didn't read this
8   report in realtime, do you agree with that statement?
9 A I can't comment about coin dealers, firearms,
10   ammunition sales, et cetera. I'm not familiar with
11   any of those. And short-term lending --
12 Q Sure.
13     Let's focus the question on the short-term lending
14   then. Would you agree with that statement in terms of
15   short-term lending?
16 A That was my understanding of -- of what was going on,
17   yes.
18 Q Why is that?
19 A Again, going back to all of the different periodicals,
20   et cetera, that were floating around, and then my --
21   our research in regards to Tribal lending entities on
22   the internet in 2012 when we were being asked to take
23   on Lac Vieux Desert's Tribal lending entities, then
24   we -- that's when we read about Operation Choke Point,
25   et cetera. Yeah.

Page 71

1 Q Were you ever contacted by any regulators regarding
2   LVD's Tribal lending entities?
3 A I was never contacted by regulators. I was contacting
4   regulators to assure that they were comfort -- I
5   was contacting the FDIC to assure that they were
6   comfortable with what Chippewa Valley Bank was
7   doing and the procedures that we were using to
8   assure that we were complying with the normal banking
9   regulations.
10 Q So let me unpack that just a little bit.
11     So what you're saying is the FDI -- FDIC never
12   affirmatively contacted you about LVD, right?
13 A I initiated all contact with the FDIC, yes.
14 Q When did you first initiate contact with the FDIC?
15 A Well, I'm going to guess a little bit, but I think it
16   was probably back when we initially did this, maybe
17   in 2012.
18 Q Do you remember who it was at the FDIC you spoke to?
19 A Well, I contacted our regional representatives --
20 Q Do you --
21 A -- out of Eau Claire and -- and Appleton.
22 Q Do you remember who those folks are?
23 A Scott Alexander and Colleen. I can't think of
24   Colleen's last name right now.
25 Q What is Scott Alexander's position at the FDIC?

Page 72

1 A I really don't know his position. He's -- he's a
2   compliance regulator.
3 Q And do you remember what Colleen did?
4 A Colleen is safety and soundness.
5 Q What is the -- what is -- what is your understanding
6   of what Colleen was doing in that role?
7 A Well, she overseen the regional offices regards to
8   the -- in regards to the -- her region's banks in
9   regards to safety and soundness examinations.
10 Q And those folks from the local office put you in
11   touch with the Chicago office, is that right?
12 A So after several requests by me, then there was a
13   meeting set up between Chippewa Valley Bank and Scott
14   and Colleen and then two individuals from the Chicago
15   office.
16 Q Do you remember who the folks from the Chicago office
17   were?
18 A I don't. And they came to Winter and met with me and
19   some of my staff members and went over the -- went
20   over -- we -- just a general discussion in regards to
21   Tribal lending entities and Chippewa Valley Bank's
22   involvement with them, but not any specific Tribal
23   lending entity.
24 Q Who were the folks from Chippewa Valley Bank that were
25   in that meeting, if you remember?

Pages 69 to 72

Page 73

1  A   Larry Johnson, Randy Somerville.  There were other
2      folks there.  I just don't -- I -- I don't remember
3      who all was in attendance.  There was five or six,
4      probably, people.
5  Q   I think you testified about Mr. Somerville earlier, but
6      who's Larry Johnson?
7  A   Larry Johnson is the chairman of the board of Chippewa
8      Valley Bank.
9  Q   What does Mr. Johnson do in his capacity as chairman
10     of the Bank?
11 A   Well, he's the chairman of our directors, so he -- he
12     conducts our board of director meetings.
13 Q   And you said you spoke with the FDIC about Tribal
14     lending entities and your relationship with them.
15         Do you remember any of the specifics of that
16     conversation?
17 A   We expressed our concern that we wanted to help the
18     local Tribes that we dealt with on a regular basis,
19     so, in other words, we were dealing with our customers,
20     already established customers, and we wanted to help
21     provide them further banking services if the FDIC
22     didn't object or feel that we were violating any
23     federal banking regulations.
24 Q   And did the FDIC object?
25 A   Not on a legal basis.  We were told that -- and I can

Page 74

1      say this because I was given permission to repeat this
2      to our local Tribes, that they felt it probably created
3      great reputational risk for Chippewa Valley Bank.
4          MR. ALBANESE:  I'm just going to not stop
5      the questioning, but just state that all the
6      statements he's describing the FDIC made are
7      hearsay, and we would object to their admission
8      at trial, but I understand this is a deposition.
9          MR. WITSCH:  Objection's noted.
10 Q   (By Mr. Witsch, continuing)  You said that you were
11     given permission to talk to the Tribes about that?
12 A   We were given permission to -- to tell the Tribes that
13     the FDIC was concerned about Chippewa Valley Bank's
14     reputational risk.
15 Q   Did you contact the Tribes about that?
16 A   I did immediately, yes.
17 Q   Did you talk to any of the Tribes beforehand?  Let
18     me -- let me clarify that question just a little
19     bit.
20         Did you talk to any -- anyone from any of the
21     Tribes before you met with the FDIC?
22 A   In regards to us having a meeting with the FDIC?
23 Q   Correct.
24 A   Not that I'm aware of --
25 Q   So you didn't --

Page 75

1  A   -- or not that I remember.
2  Q   You didn't speak with Chairman Williams beforehand?
3  A   I don't remember having to.  I can't say that with
4      complete certainty.
5  Q   Did you communicate to the Tribes that the FDIC was
6      of the view that what the Tribes were doing was
7      lawful?
8  A   Could you say that again?
9  Q   Yeah.
10         When you went and spoke with the Tribes after
11     your meeting with the FDIC, did you communicate to
12     them that the FDIC viewed what they were doing as
13     legal?
14 A   I did not.  The FDIC I don't think commented on what
15     was legal and what wasn't.  What they commented on
16     for the most part was is the reputational risk.
17         MR. WITSCH:  This is going to be No. 16.
18         (Deposition Exhibit No. 16 was marked for
19     identification.)
20 Q   (By Mr. Witsch, continuing)  Mr. Gerber, I've just
21     marked a document as No. 16.  It's an email from the
22     Bank's files.
23         And in the bottom email on the first page here,
24     it's an email from Matt Martorello to you dated
25     September 4th, 2013.

Page 76

1      Mr. Martorello writes to you, Hi Rick, look --
2      looking forward to hearing how your meeting with the
3      FDIC went today, and any resulting effect on Red Rock,
4      slash, Duck Creek bank accounts, potential for RCC
5      processing, and maybe -- maybe even stepping into the
6      ACH business.
7          Did I read that correctly?
8  A   Yes.
9  Q   And you respond to Mr. Martorello on September 5th,
10     2013 -- sorry.  Later on on September 4th, 2013, the
11     FDIC delivered a different message to CVB today in
12     that TLEs are not illegal and that they will not be
13     exercising any moral values, only legal matters.  All
14     good news.  They backed away from any intimidating
15     stance in what CVB is doing completely.  With that
16     said, they stated that they would give CV -- CVB
17     some outline as to how we can transact businesses --
18     sorry.  How we can transact business and feel somewhat
19     comfortable.  They did express a concern with ACH
20     processing and risks associated with it.  I am not
21     sure CVB's board will allow us to do ACH clearing.
22     I am confident we can continue with our present
23     business.
24         Did I read that correctly?
25 A   Yes.